Pamela K. Fulmer (Cal. Bar No. 154736)
pam@tacticallawgroup.com
Dee A. Ware (Cal. Bar 154549)
dware@tacticallawgroup.com
Tactical Law Group LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-3509
Fax: (415) 231- 5272

Li Chen (*pro hac vice*)
lchen@chenleftwich.com
Kristoffer Leftwich (*pro hac vice*)
kleftwich@chenleftwich.com
Chen Leftwich LLP
8501 N MacArthur Blvd #631009
Irving, TX 75063
Telephone: (214) 627-9950
Fax: (214) 627-9940

Attorneys for Defendant and Counterclaim Plaintiff
NEC Corporation of America

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., a Delaware corporation and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NEC CORPORATION OF AMERICA, a Nevada corporation,<br><br>Defendant.<br><br>NEC CORPORATION OF AMERICA, a Nevada corporation,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>ORACLE AMERICA, INC., a Delaware corporation and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Counterclaim Defendants. | Case Number: 3:21-cv-05270-CRB<br><br>**DEFENDANT NEC CORPORATION OF AMERICA'S ANSWER TO COMPLAINT FOR COPYRIGHT INFRINGEMENT AND BREACH OF CONTRACT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**AND**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed:        July 8, 2021<br>Answer/Countercl. Filed:    Sept. 1, 2021<br>Judge:        Hon. Charles R. Breyer, CR 6 |

Defendant NEC Corporation of America ("NECAM") hereby responds to Plaintiff Oracle America, Inc.'s ("Oracle America") and Oracle International Corporation's ("Oracle International") (together "Oracle") Complaint for Copyright Infringement and Breach of Contract ("Complaint"). NECAM denies all allegations in the Complaint, whether express or implied, that are not specifically admitted below. Any factual allegation below is admitted only as to the specific admitted facts and not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts. NECAM further denies that Oracle America and Oracle International are entitled to the requested relief or any other relief.

## PARTIES

1.     Plaintiff Oracle America, Inc. ("Oracle America") is a corporation organized under the laws of the State of Delaware with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065. Oracle America develops and licenses certain intellectual property, including the Oracle Database, its database management software, and provides related support and consulting services to its licensed customers.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

2.     Plaintiff Oracle International Corporation ("Oracle International") is a corporation organized under the laws of the State of California with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065. Oracle International owns and licenses certain intellectual property, including the Oracle Database. Oracle International, either on its own or jointly with Oracle America (depending on the registration), holds all interest, right, and title to the copyrights in the Oracle Database and the right to bring claims for infringement of those copyrights.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

3.     Defendant NEC Corporation of America ("NECAM") is a corporation organized under the laws of the State of Nevada with its headquarters and principal place of business at 3929 W John Carpenter Freeway, Irving, Texas, 75063. On information and belief, NECAM conducts substantial business operations and has customers around the United States, including within

NECAM'S ANSWER AND COUNTERCLAIMS

California and the Northern District of California. On information and belief, NECAM offers a range of software and hardware products for end users across a spectrum of industries. On information and belief, NECAM is a subsidiary of NEC Corporation, a Japanese multinational information technology company headquartered in Minato, Japan.

**ANSWER:** NECAM admits that it is a corporation organized under the laws of the State of Nevada with its headquarters and principal place of business at 3929 W John Carpenter Freeway, Irving, Texas, 75063. NECAM admits that it conducts business operations and has customers around the United States, including within California. NECAM admits that it offers a range of software and hardware products for end users across a spectrum of industries. NECAM admits that it is a subsidiary of NEC Corporation, which is a multinational information technology company headquartered in Minato, Tokyo, Japan. NECAM lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this paragraph and therefore denies the same.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367. This is an action for copyright infringement arising under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.* This Court has subject matter jurisdiction over the copyright infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

**ANSWER:** This paragraph recites no factual allegation. Assertions about the applicability of statutes and the existence of jurisdiction are questions of law for the Court to decide and, therefore, require no answer. NECAM denies that Oracle's claims have merit.

5.     The Court also has subject matter jurisdiction under 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different States.

**ANSWER:** The applicability of statutes and the existence of jurisdiction are questions of law for the Court to decide and, therefore, require no answer. NECAM lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

6. This Court has personal jurisdiction over NECAM because NECAM has consented to the exclusive jurisdiction of, and venue in, the courts in San Francisco and Santa Clara counties in California, in any disputes arising out of or relating to the Oracle PartnerNetwork Agreement ("OPN Agreement") and the related Master Distribution Agreement ("MDA") between NECAM and Oracle America, and this is such a dispute. *See* 2018 MDA § Q(1) ("This Agreement is governed by the substantive and procedural laws of the State of California and you and Oracle agree to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California, in any dispute arising out of or relating to this agreement."); 2020 OPN Agreement § W(1) ("This agreement is governed by the substantive and procedural laws of the State of California and you and Oracle agree to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California in any disputes arising out of or relating to this agreement.").

> **ANSWER:** The meaning and effect of contract language and the existence of jurisdiction and propriety of venue in this Court are all questions of law for the Court to decide and, therefore, require no answer. NECAM admits that the OPN Agreement and the MDA contain the language recited above.

7. The Court also has jurisdiction over NECAM because NECAM has conducted and regularly conducts business within the State of California and within this judicial district. For example, on information and belief, NECAM is registered with the California Secretary of State to do business in California, has offices located [in] California, has employees who work and reside in California, and has one or more customers located in California. On information and belief, NECAM – directly or through intermediaries – makes, distributes, offers for sale or license, sells or licenses, or advertises its products and services in the United States, the State of California, and the Northern District of California.

> **ANSWER:** The existence of jurisdiction is a question of law for the Court to decide and, therefore, requires no answer. NECAM admits the factual allegations of this paragraph.

Case No. 3:21-cv-05270-CRB

NECAM'S ANSWER AND COUNTERCLAIMS

8.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim and the actual harm to Oracle occurred in this district, where Oracle America and Oracle International have their principal places of business, by reason of NECAM's conduct. Venue is further proper in this District under 28 U.S.C. § 1400(a), as NECAM is subject to personal jurisdiction within this district. Venue is further proper in this District, as NECAM has consented to venue here, as discussed above.

**ANSWER:** The propriety of venue and the existence of jurisdiction are questions of law for the Court to decide and, therefore, require no answer. NECAM denies the factual allegations of this paragraph.

## INTRADISTRICT ASSIGNMENT

9.      This action is an Intellectual Property Action, as it arises under the copyright laws of the United States and implicates Oracle's intellectual property rights, and should thus be assigned on a district-wide basis under Civil Local Rule 3-2(c).

**ANSWER:** NECAM admits that this action alleges intellectual property claims that are subject to assignment on a district wide-basis pursuant to Civil Local Rule 3-2(c).

## BACKGROUND

### A. Oracle's Industry-Leading Software

10.      Oracle is a global leader in database management software and technology, cloud-engineered systems, and enterprise software products.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

11.      One of Oracle's flagship products is the Oracle Database, a software product designed to enable reliable and secure storage, retrieval, and manipulation of all forms of data, which has become the world's most popular enterprise database. The Oracle Database is licensed throughout the world by businesses and organizations of different sizes for a multitude of purposes.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

12.     Oracle currently licenses the Oracle Database in different editions, including Standard Edition 1 ("Database SE1"), Standard Edition 2 ("Database SE2"), and a more robust (and expensive) Enterprise Edition ("Database EE"). Oracle also offers specialized programs that supplement or complement the Oracle Database and address particular customer requirements, including Real Application Clusters, Partitioning, Diagnostics, and Tuning Pack (the "Database Options and Packs").

> **ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

13.     Oracle is the owner or exclusive licensee of the copyrights and copyright applications for the Oracle Database and the Database Options and Packs. The works are properly registered with the United States Copyright and Trademark Office, as alleged in more detail below. [Associated Oracle footnote:] Because Database SE1 and Database SE2 (collectively "Database SE") share the same code base as Database EE, Oracle's "Oracle Database" copyright registrations cover both Database SE and Database EE. *See infra* ¶ 39 (table of copyright registrations).

> **ANSWER**: NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph or the associated footnote and therefore denies the same.

14.     As part of its business and in certain circumstances, Oracle allows third-party companies – members of the Oracle PartnerNetwork ("OPN") – to duplicate the Oracle Database (and other Oracle software, including the Database Options and Packs) and distribute it, either on its own or with other software applications, to end users. Oracle offers OPN members multiple ways to distribute Oracle software (and associated licenses) to end users, including, but not limited to, the three alternative distribution methods listed below, provided the OPN member has an active OPN membership and has entered into a Master Distribution Agreement with a specific distribution addendum with Oracle that covers the method of distribution to be used. The distribution methods listed below are listed in order of increasing breadth, flexibility, and cost:

(i)     Embedded Software License ("ESL") – Oracle grants the OPN member a right to distribute to end users Oracle software, and a license for it, "embedded" within one or more specified applications developed by the member. To obtain this right, the OPN member must execute an Embedded Software License Distribution Addendum ("ESL

NECAM'S ANSWER AND COUNTERCLAIMS

Addendum"), and its distributions are subject to the terms and conditions of the OPN Agreement, Master Distribution Agreement, and the ESL Addendum. This is the most restrictive distribution method, as the ESL Addendum, among other things, imposes strict limitations on exactly how an OPN member must embed the Oracle programs and how its end users can access the Oracle programs.

(ii)     Application Specific Full Use ("ASFU") – Oracle grants the OPN member a right to distribute to end users Oracle software, and a license for it, solely for use in conjunction with one or more specified applications developed by the OPN member. To obtain this right, the OPN member must execute an Application Specific Full Use Distribution Addendum ("ASFU Addendum"), and its distributions are subject to the terms and conditions of the OPN Agreement, Master Distribution Agreement, and ASFU Addendum. This method is broader and more flexible (and more expensive) than the ESL method described above but still limits the end user to using the licensed Oracle software only with the specific application(s) that the member identifies to Oracle.

(iii)    Full Use – Oracle grants the OPN member a general right to distribute to end users Oracle software, and a license for it, without the requirement, among other things, that it be used solely in conjunction with an application developed by the OPN member. To obtain this right, the OPN member must execute a Full Use Distribution Addendum ("Full Use Addendum"), and its distributions are subject to the terms and conditions of the OPN Agreement, Master Distribution Agreement and Full Use Addendum. This is the broadest, most flexible, and most expensive method.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

15.     Per Oracle's standard policy, under each of the three distribution methods listed above, an OPN member is required to pay to Oracle a license fee for all Oracle software that it distributes and a support fee for support services from Oracle, if ordered, for the distributed Oracle software, and

1  an annual technical support fee each year for ongoing support services from Oracle, if ordered, for

2  the distributed Oracle software.

3       **ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth

4       of the allegations in this paragraph and therefore denies the same.

5      **B.  NECAM's Unauthorized Use of the Oracle Database and the Database Options and**

6  **Packs**

7      16.    For more than fifteen years, NECAM was an OPN member with an active OPN

8  Agreement with Oracle. NECAM first entered into an OPN Agreement with Oracle in or before

9  2004, and the parties renewed their OPN Agreement from time to time, most recently effective in

10  August 2020. The parties' OPN Agreement set forth general terms that governed NECAM's OPN

11  membership, and it provided NECAM with a limited license to use Oracle software to develop

12  value-added applications that incorporated Oracle software under the following terms and

13  conditions:

14      "Oracle grants you a non-exclusive, limited license to use the technology programs

15      identified in the OPN policies for your partner level to: (a) demonstrate, develop or

16      prototype your value added package for the intended commercial use of multiple end users;

17      (b) provide technical support for employees and end users solely in connection with your

18      value added package that you distribute pursuant to a distribution agreement with Oracle

19      that authorizes you to provide technical support for the Oracle programs; and (c) provide

20      training for the value added package to employees and end users to whom you have

21      distributed the value added package pursuant to a distribution agreement with Oracle.

22      Development licenses may not be used to develop or administer your value added package

23      for the exclusive use of a specific end user."

24  *See* 2020 OPN Agreement § C(2) (emphasis added).

25  [Associated Oracle footnote:] NECAM was an OPN member (or "associate" member) through an

26  OPN membership of its corporate parent, NEC Corporation. NECAM entered into its OPN

27  Agreement with Oracle by written agreement of its corporate parent NEC Corporation.

28

**ANSWER:** NECAM admits that it was an OPN member with an active OPN Agreement with Oracle for more than 15 years. NECAM admits that it entered into an OPN Agreement with Oracle around 2004, and that the parties have renewed the OPN Agreement from time to time, including a renewal with an effective date in or around August 2020. NECAM admits that the block language recited in paragraph 16 appears absent added emphasis in the 2020 OPN Agreement § C(2). NECAM denies the remainder of the allegations in this paragraph.

17.     In addition to entering into the OPN Agreement, NECAM and Oracle entered into other written agreements that provided – and expressly defined – NECAM's right to distribute Oracle software to end users. These additional agreements include, but are not limited to, the following:

- Oracle PartnerNetwork Application Specific Full Use Program Distribution Agreement, effective March 7, 2005;

- Oracle PartnerNetwork Application Specific Full Use Program Distribution Agreement, effective April 18, 2007;

- Oracle PartnerNetwork Application Specific Full Use Program Distribution Agreement, effective August 24, 2009;

- Oracle PartnerNetwork Application Specific Full Use Program Distribution Agreement, effective November 29, 2011;

- Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc., effective December 11, 2013 ("2013 MDA");

- Application Specific Full Use Program Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle, America, Inc., effective December 11, 2013 (collectively, the "2013 ASFU Addendum");

- Full Use Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2013 MDA], effective September 22, 2016 (collectively, the "2016 Full Use Addendum");

NECAM'S ANSWER AND COUNTERCLAIMS

- Embedded Software License Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2013 MDA], effective March 8, 2017 (collectively, the "2017 ESL Addendum");

- Oracle PartnerNetwork Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc., effective December 6, 2018 ("2018 MDA");

- Amendment One to the Oracle PartnerNetwork Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2018 MDA], effective December 19, 2018;

- Full Use License Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2018 MDA], effective December 19, 2018 (collectively, the "2018 Full Use Addendum").

- Application Specific Full Use Program Use Program Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2018 MDA], effective December 19, 2018 (collectively, the "2018 AFSU Addendum").

- Embedded Software License Distribution Addendum to the Oracle PartnerNetwork ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. [the 2018 MDA] effective December 19, 2018 (collectively, the "2018 ESL Addendum").

**ANSWER:** NECAM admits that it entered into the listed agreements with Oracle. NECAM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

18.     As a long-time OPN member and Oracle licensee, NECAM was (and is) intimately familiar with the Oracle PartnerNetwork and the different distribution methods Oracle offers to its OPN members – ESL, ASFU, and Full Use. In the past fifteen years, NECAM has distributed

licenses to Oracle software using all three distribution methods – ESL, ASFU, and Full Use – under the agreements set forth above.

> **ANSWER:** NECAM admits that it has distributed Oracle software licenses under some or all of the agreements set forth in paragraph 17. NECAM denies Oracle's allegations about NECAM's familiarity with Oracle's PartnerNetwork and distribution models. NECAM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

19.     As an OPN member, and under the agreements set forth above, NECAM has distributed the Oracle Database and the Database Options and Packs with software solutions that it has developed and marketed, including a value-added application called "Integra-ID 5" – an application NECAM has marketed as biometrics identification system used by law enforcement agencies. On information and belief, NECAM has previously marketed this value-added application (or its predecessors) under the name "Integra-ID" and as "Automated Biometrics Identification System."

> **ANSWER:** Admitted.

20.     Between 2004 and 2017, NECAM distributed Integra-ID 5, or its predecessor application, with the Oracle Database and the Database Options and Packs to end users with ***ASFU*** licenses from Oracle. NECAM did so under ASFU Addenda to the parties' then applicable-MDA, including an ASFU Addendum to the 2013 MDA and a similar ASFU Addendum to the 2018 MDA. Under these ASFU Addenda, Oracle provided NECAM with the right to distribute to end-users its Integra-ID 5 application with a license to the Oracle Database and the Database Options and Packs, and NECAM agreed to pay license fees (and support fees) to Oracle based on the number of Integra-ID 5 application packages NECAM distributed with an AFSU license. [Associated Oracle footnote:] In addition to executing the ADFU Addendum, as a prerequisite before Oracle would allow NECAM to distribute Oracle software with its Integra-ID 5 application, NECAM submitted for Oracle's approval an ASFU Application Package Registration Form for its Integra-ID 5 application ("ASFU APRF"). The ASFU APRF contained a high-level summary of

NECAM'S ANSWER AND COUNTERCLAIMS

certain functionality of the Integra ID-5 application and its use of the Oracle Database and the Database Options.

**ANSWER:** NECAM admits that, between 2004 and 2017, NECAM distributed Integra-ID 5, or its predecessor applications, with the Oracle Database and one or more of the Database Options and Packs to end users with licenses from Oracle. NECAM admits that it did so under the parties' then applicable-MDA. NECAM admits that, during this time, NECAM had the right to distribute to end-users its Integra-ID 5 application with a license to the Oracle Database and the Database Options and Packs. NECAM admits that it has previously submitted for Oracle's approval an ASFU Application Package Registration Form for its Integra-ID 5 application ("ASFU APRF") and that the ASFU APRF contained a summary of certain functionality of the Integra ID-5 application and its use of the Oracle Database and any applicable Database Options and Packs. NECAM lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and therefore denies the same.

21.     In 2017 – while retaining its right to distribute Integra-ID 5 with the Oracle Database and the Database Options and Packs through *ASFU* licenses from Oracle – NECAM sought and obtained from Oracle the right to distribute Integra-ID 5 embedded with the Oracle Database and the Database Options and Packs through more restrictive *ESL licenses*. As noted, the ESL license distribution method is a less expensive, but more restrictive, option for NECAM to distribute its value-added application embedded with Oracle software. In an ESL Addendum to the 2013 MDA, Oracle provided NECAM with the right to distribute to end users the Oracle Database and the Database Options and Packs, and ESL licenses for it, embedded into Integra-ID 5, and NECAM agreed to pay license fees (and support fees) to Oracle (fees much lower than ASFU license and support fees) based on the number of Integra-ID 5 application packages NECAM distributed under the ESL addendum. The parties renewed this right in early 2019 through an ESL Addendum to the 2018 MDA. [Associated Oracle footnote:] In addition to executing the ESL distribution addendum, and as a prerequisite before Oracle would allow NECAM to distribute its Integra-ID 5 application with Oracle software, NECAM submitted for Oracle's approval an ESL Application Package

Registration Form for its Integra ID-5 application ("APRF"). The ESL APRF contained a high-level summary of certain functionality of the Integra ID-5 application and its use of the Oracle Database and the Database Options and Packs. *See* 2017 ESL APRF; *see also* 2019 ESL APRF, submitted and approved when the parties renewed the ESL license in early 2019.

> **ANSWER:** NECAM admits that in 2017 it obtained the right to distribute Integra-ID 5 embedded with the Oracle Database and the Database Options and Packs through ESL licenses. NECAM admits that the ESL license distribution method is more restrictive than every other license method offered by Oracle. NECAM admits that it submitted an ESL Application Package Registration Form ("APRF") at Oracle's request in which NECAM described certain functionality of the Integra-ID 5 application and its use of the Oracle Database and the Database Options and Packs. However, NECAM denies that it sought the ESL license method from Oracle. Oracle selected and recommended the ESL license model, asked NECAM to fill out and submit the ESL APRF, and pushed NECAM to accept the ESL license model even though NECAM informed Oracle in the APRF exactly how it planned to use and distribute the Oracle Database and Database Options and Packs. Oracle even directed NECAM to alter its responses to the APRF in order to qualify for the ESL license method. NECAM denies the remaining allegations of this paragraph and associated footnote.

22.     The ESL Addenda under which NECAM obtained the right to distribute ESL licenses for the Oracle Database and the Database Options and Packs embedded within its Integra-ID 5 application expressly (and narrowly) define "embedded" to include certain specified requirements, including the following:

- "The end user [*i.e.*, NECAM's software customers] must not be permitted to install or configure the programs separately and independently from the application package;"
- "The application program must be designed and developed by you to eliminate program administration tasks by the end user by including all program administration functions within the application program. You may not customize the application package for a single end user or a group of end users. All administration scripts including startup,

NECAM'S ANSWER AND COUNTERCLAIMS

shutdown, and backup are to be provided by you within the application program. The end user must not be permitted to access the programs directly but rather only through the application program;"

- "All information from the programs must be accessed by the end user either through prepackaged reports, or ad hoc reports that are developed by you, and included in the application package which do not require or permit the end user to navigate the underlying data schema. If you include Oracle or third party reporting tools in the application package, such tools must be embedded in the application package pursuant to the terms of this agreement;"

- "If the application package must interface with another application or database, the end user is not permitted to directly access the database or use Oracle-supplied APIs to establish the transfer of data. To transfer data, you must set up predefined APIs unique to the application package and management of the data transfer must be done through the application program;"

- "Only you can access the programs directly for purposes of technical assistance to your end user and such access is limited to providing technical assistance, including troubleshooting, problem resolution, and support assistance. You shall not provide remote or onsite program administration tasks on behalf of the end user that are otherwise prohibited under the terms of this agreement."

*See* 2017 ESL Addendum and 2018 ESL Addendum.

**ANSWER:** NECAM admits that the blocks of text recited in this paragraph appear in one or the other of the 2017 ESL Addendum or the 2018 ESL Addendum. NECAM denies Oracle's characterization of these blocks of text. NECAM denies any remaining allegations of this paragraph.

23.     In the OPN Agreement and the MDA, NECAM expressly agreed Oracle may audit NECAM's use and distribution of Oracle's software. NECAM further agreed to "pay within 30 days of written notification any fees applicable to [NECAM's] distribution of the programs, hardware,

learning credits and/or services in excess of [NECAM's] rights and any underpaid fees." The OPN Agreement states:

> "Upon 45 days written notice, <u>Oracle may audit your use of the Oracle property</u>. Any such audit shall not unreasonably interfere with your normal business operations. You agree to cooperate with Oracle's audit and provide reasonable assistance and access to information including but not limited to relevant books, records, agreements, servers, technical personnel, and order reporting systems. <u>You agree to pay within 30 days of written notification any fees applicable to your use of the Oracle property in excess of your license rights.</u> If you do not pay, Oracle can end your technical support, licenses, your OPN membership and this agreement, and/or may choose not to accept your application to renew this agreement at such time of renewal. You agree that Oracle shall not be responsible for any of your costs incurred in cooperating with the audit."

*See* 2020 OPN Agreement § W(5) (emphasis added). The MDA states:

> "You agree that you will keep accurate books and records in connection with the activities under this agreement and any applicable distribution addenda. Upon 45 days written notice, <u>Oracle may audit your distribution of the programs, hardware, learning credits and services and any other activities under this agreement and any applicable distribution addenda</u>. Any such audit shall not unreasonably interfere with your normal business operations. You agree to cooperate with Oracle's audit and provide reasonable assistance and access to information including but not limited to relevant books, records, agreements, servers, technical personnel, and other reporting systems. Upon Oracle's request, you will also provide to Oracle a system generated list of the Oracle program licenses, hardware, learning credits and/or services distributed to end users under this agreement during the time period specified by Oracle and any supporting documentation requested by Oracle pursuant to the terms of Section D (Order Terms) for the purposes of validating the completeness and accuracy of your obligations under this agreement and any applicable distribution addenda. <u>You agree to pay within 30 days of written notification any fees applicable to your distribution of the programs, hardware, learning credits and/or services in excess of your</u>

<u>rights and any underpaid fees</u>. If you do not pay, Oracle can end your technical support,
licenses, services, the validity of any learning credits, and this agreement and/or may choose
not to accept your application to renew this agreement at such time of renewal. Upon
Oracle's request, you agree to audit end user(s) and report the findings to Oracle, or assign
your right to audit end user(s) to Oracle. You agree that Oracle shall not be responsible for
any of your costs incurred in cooperating with this audit."

*See* 2018 MDA § Q(5) (emphasis added).

**ANSWER:**  NECAM admits that the text quoted in this paragraph appears absent added
emphasis in the cited documents. NECAM denies Oracle's characterization of the quoted
text. NECAM denies any remaining allegations in this paragraph.

24.     In December 2019, Oracle exercised its contractual right to audit NECAM's use and
distribution of Oracle software, including, but not limited to, its distributions of Oracle software
with or embedded within its own applications, such as Integra-ID 5, and Oracle found numerous
compliance issues related to these distributions. Based on information that NECAM itself provided
as part of the audit, among other issues, Oracle found the following:

(i)     NECAM had distributed the Oracle Database and the Database Options and Packs
with its Integra-ID 5 application to certain end users in excess of its distribution
rights under the ESL Addenda; NECAM had improperly reported those distributions
to Oracle as having been made pursuant to NECAM's *ESL* Addenda; and NECAM
had improperly paid Oracle license fees on those distributions at the *ESL* rate –
rather than at the higher *ASFU* license fee rate. NECAM had distributed the Oracle
Database *with* Integra-ID 5 but not "embedded" with it, as required to be covered by
ESL Addenda. In particular, Oracle found that NECAM customized its Integra-ID 5
application for specific end users, certain end users were permitted to create custom
reports within the application and had customer API's to establish transfer of data,
and NECAM performed program administrations tasks, on the end user's behalf, in
excess of the rights granted pursuant to the ESL Addenda. These distributions are not
permitted by NECAM's ESL Addendum; instead, they are permitted by NECAM's

NECAM'S ANSWER AND COUNTERCLAIMS

ASFU Addenda, and NECAM is obligated under the applicable ASFU Addendum to pay Oracle ASFU license fees (and support fees) for them, which NECAM has not done.

(ii)     NECAM had distributed the Oracle Database (and other Oracle software) in excess of its distribution rights under its ASFU Addenda as well, by distributing it to an end user (the Ohio State Police) for use with a custom application (called "Openfox CCH") for that user that was being developed by an entity other than NECAM; NECAM had improperly reported those distributions to Oracle as having been made pursuant to NECAM's *ASFU* Addendum; and NECAM had improperly paid Oracle license fees on those distributions at the *AFSU* rate, - rather than at the higher *Full Use* license fee rate. These distributions are not permitted by the ASFU Addendum, since the ASFU Addendum does not authorize distributions of Oracle software for use with applications developed by an entity other than NECAM. These distributions instead are permitted by NECAM's Full Use Addendum, and NECAM is obligated under the applicable Full Use Addendum to pay Oracle Full Use license fees (and support fees) for them, which NECAM has not done.

(iii)    NECAM had previously failed to report certain distributions of the Oracle Database with its Integra-ID 5 application to end users as required by the applicable ASFU Addendum, or NECAM had not reported the correct quantity of licenses for those users.

(iv)    NECAM had on-premise development environments using the Oracle Database and the Database Options and Packs in excess of the rights granted to NECAM under its OPN Agreement and other agreements with Oracle. On information and belief, NECAM's on-premise development environment contained separate environments using the Oracle Database and the Database Options and Packs for each of its end users, which would allow it to develop and administer updated and fixes, among other things, for each specific end user. This use of the Oracle Database and the Database Options and Packs is not licensed under any existing agreement.

Given the magnitude of the issues that Oracle has identified above and as several of the issues relate to unreported royalties and NECAM's failure to provide information related to its on-premise development environments, Oracle does not know whether this is the full scope of NECAM's improper conduct pertaining to the OPN Agreement and MDA, or to the parties' other agreements and addenda.

> **ANSWER:** NECAM admits that Oracle audited NECAM's use and distribution of Oracle software in or around December 2019. NECAM denies the existence of "compliance issues." NECAM denies all of Oracle's audit findings. NECAM denies all remaining allegations of this paragraph.

**C. <u>Oracle's Attempts to Settle the Licensing Dispute with NECAM</u>**

25.     In October 2020, Oracle sent an Audit Report to NECAM, summarizing Oracle's audit findings, subject to the accuracy and completeness of the information provided by NECAM, and asking NECAM to resolve the compliance findings within 30 days as required by the parties' agreements. In the Audit Report, Oracle advised that NECAM needed to procure (pay for) additional ASFU and Full Use licenses for its prior distributions, and Oracle further advised that NECAM had previously failed to report (or had under-reported) certain distributions, as discussed above. In addition, Oracle asked NECAM to provide Oracle with additional information regarding its on-premise development environment to enable Oracle to determine the extent to which they exceeded NECAM's rights.

> **ANSWER:** NECAM admits that Oracle sent an Audit Report to NECAM in October 2020. The findings of Oracles 2020 Audit report are baseless and contradict the terms of NECAM's agreements with Oracle. NECAM therefore denies the findings of Oracle's 2020 Audit Report. NECAM denies that the parties' agreements require NECAM to "resolve" such compliance findings. NECAM denies that it needs to procure additional ASFU and Full Use licenses for prior distributions and that it had failed to report or under-reported distributions. NECAM admits that Oracle demanded additional and unwarranted license fees from NECAM based on its baseless audit compliance findings. NECAM admits that Oracle sought additional information that NECAM was not obligated to provide to generate more

baseless audit compliance findings that contradict the terms of NECAM's agreements with Oracle so that Oracle could demand additional and unwarranted license fees. NECAM denies any remaining allegations of this paragraph.

26.     NECAM did not resolve Oracle's audit compliance findings within 30 days – nor did it do so in the many months that have followed.

**ANSWER:** All allegations of this paragraph are denied. NECAM specifically denies any obligation to "resolve" the baseless audit compliance findings of Oracle's 2020 Audit Report.

27.     Oracle has repeatedly asked NECAM to resolve the audit compliance findings, but NECAM has not done so. To date, NECAM has not paid the full license and support fees NECAM owes for its distributions of Oracle software described in paragraphs 24(i) and (ii) above. NECAM has not paid Oracle for the distributions it previously failed to report or under-reported. And NECAM has not provided Oracle with the additional information Oracle requested regarding NECAM's on-premise development environments, which is part of Oracle's audit process.

**ANSWER:** NECAM admits that Oracle has demanded license and support fees to which it is not entitled. NECAM denies that any additional fees or royalties are owed. NECAM denies that it has failed to report or under-reported any distributions as required by its agreements with Oracle. NECAM denies the findings of Oracle's 2020 Audit Report. The findings of Oracle's 2020 Audit Report are baseless and contradict the terms of NECAM's agreements with Oracle. NECAM denies that it has any obligation to "resolve" such findings. NECAM denies that Oracle is entitled to additional information regarding NECAM's on-premise development environments. NECAM denies the remaining allegations in this paragraph.

28.     On January 19, 2021, Oracle sent a letter to NECAM notifying NECAM that due to NEC's continued failure to resolve the audit findings, Oracle considers NECAM to be in material breach of its agreements with Oracle. But after receiving Oracle's letter, NECAM still did not resolve the audit findings.

NECAM'S ANSWER AND COUNTERCLAIMS

1       **ANSWER:** NECAM admits that Oracle sent a letter on or about January 19, 2021,

2       purporting to notify NECAM of material breach. NECAM denies the findings presented in

3       Oracle's 2020 Audit Report. NECAM denies any obligation to "resolve" findings that are

4       baseless and contradict the terms of NECAM's agreements with Oracle. NECAM denies

5       that it has breached any of its agreements with Oracle, materially or otherwise. NECAM

6       denies all other allegations in this paragraph.

7       29.     On March 5, 2021, Oracle sent another letter to NECAM, notifying NECAM that

8  Oracle was, by its letter, terminating NECAM's membership in the Oracle PartnerNetwork, the

9  2018 MDA, and all related ASFU distribution addenda and ESL distribution addenda.

10      **ANSWER:** NECAM admits that, on or about March 5, 2021, Oracle sent a letter purporting

11      to notify NECAM of the termination of NECAM's membership in the Oracle

12      PartnerNetwork, the 2018 MDA, and all related ASFU distribution addenda and ESL

13      distribution addenda. NECAM denies that Oracle is entitled to terminate the membership,

14      agreements, or addenda. NECAM denies that any purported termination or notification of

15      termination is effective. Any remaining allegations in this paragraph are denied.

16      30.     Because NECAM has refused to provide Oracle with information related to its use of

17 the Oracle Database in NECAM's on-premise software development environment, Oracle does not

18 yet know the full details of NECAM's use of the Oracle Database in that environment.

19      **ANSWER:** NECAM denies that Oracle is entitled to information related to its use of the

20      Oracle Database in NECAM's on-premise software development environment. NECAM

21      lacks knowledge or information sufficient to form a belief as to the truth of the remaining

22      allegations in this paragraph and therefore denies the same.

23                            **<u>FIRST CAUSE OF ACTION</u>**

24                                  **Breach of Contract**

25      31.     Oracle incorporates by reference each of the preceding paragraphs 1 through 30 as if

26 fully set forth herein.

27      **ANSWER:** NECAM repeats and re-alleges its responses to the foregoing paragraphs as if

28      fully set forth herein

                                          19                    Case No. 3:21-cv-05270-CRB

32.     Oracle and NECAM entered into contracts with Oracle, including the OPN Agreement, the 2013 MDA, the 2018 MDA, and the related Full Use, ASFU, and ESL Addenda.

**ANSWER:** Admitted.

33.     Oracle did all, or substantially all, of the significant things that the contracts required it to do.

**ANSWER:** Denied.

34.     NECAM breached its contracts with Oracle by its acts and omissions, including failing to pay license and support fees owed to Oracle under the contracts and failing to provide information to Oracle as required by the contracts' audit provisions.  For example, NECAM breached the 2013 MDA, the 2013 ASFU Addendum, the 2018 MDA, and the ASFU Addenda by failing to report and pay license fees (and support fees) owed under the ASFU Addenda for distributions of its Integra-ID 5 application with the Oracle Database and the Database Options and Packs that were not permitted by NECAM's ESL Addenda.  As another example, NECAM breached the 2013 MDA and the 2016 Full Use Addendum by failing to report and pay license fees (and support fees) owed under the Full Use Distribution Addendum for distributions of the Oracle Database (and other Oracle software) to the Ohio State Police that were not permitted by NECAM's ASFU addendum.  And, as another example, NECAM breached its duty under the OPN Agreement and the 2018 MDA to cooperate with Oracle's audit and provide reasonable assistance and access to information, by failing to provide Oracle with additional information regarding its on-premise development environments to enable Oracle to determine the extent to which they exceeded NECAM's rights, as Oracle repeatedly requested.

**ANSWER:** Denied.

35.     As a result of NECAM's breaches of contract, Oracle has been damaged in an amount exceeding $7,000,000.

**ANSWER:** Denied.

36.     NECAM's breaches of contract were a substantial factor in causing Oracle's harm.

**ANSWER:** Denied.

## SECOND CAUSE OF ACTION

**Copyright Infringement Under 17 U.S.C. §§ 101 *et seq.* and 17 U.S.C. §§ 501 *et seq.***

37.     Oracle incorporates by reference each of the preceding paragraphs 1 through 36 as if fully set forth herein.

**ANSWER:** NECAM repeats and re-alleges its responses to the foregoing paragraphs as if fully set forth herein.

38.     Oracle owns valid and enforceable copyrights in all its software products, including the Oracle Database and the Database Options and Packs, which are creative works of original authorship and copyrightable subject matter. Oracle has owned these copyrights throughout the time of NECAM's infringement.

**ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

39.     In compliance with the Copyright Regulations, Oracle has registered or filed with the Copyright Office copyright applications, registration fees, and deposits of the Oracle Database and the Database Options and Packs.  Oracle is the owner or exclusive licensee of all right, title, and interest to the registrations and copyright applications for the Oracle Database and the Database Options and Packs, as described below:

| Title of Work | Registration Number | Date Issued |
|---|---|---|
| Oracle9I Database Enterprise Edition Release 1 | TX 5-673-281 | June 13, 2003 |
| Oracle9I Database Enterprise Edition Release 2 | TX 5-673-282 | June 13, 2003 |
| Oracle Database 10g Release 1 | TX 6-938-648 | January 16, 2009 |
| Oracle Database 10g Release 2 | TX 6-942-003 | June 29, 2009 |
| Oracle Database 11g Release 1 | TX 7-324-157 | March 24, 2011 |
| Oracle Database 11g Release 2 | TX 7-324-158 | March 24, 2011 |
| Oracle Database 12c Release 1 (12.1) | TX 8-188-258 | May 9, 2016 |
| Oracle Database 18c (18.3) | TX 8-843-054 | February 26, 2020 |
| Oracle Database 19c (19.3) | TX 8-843-065 | February 26, 2020 |

| | | |
|---|---|---|
| Oracle Tuning Pack 10g, Release 2 (10.2) | TX 7-912-167 | September 25, 2014 |
| Oracle Tuning Pack 10g, Release 1 (10.1) | TX 7-912-168 | September 25, 2014 |
| Oracle Tuning Pack 11g, Release 1 (11.1) | TX 7-913-004 | September 25, 2014 |
| Oracle Tuning Pack 11g, Release 2 (11.2) | TX 7-913-797 | September 25, 2014 |
| Oracle Tuning Pack 12c, Release 1 (12.1) | TX 8-429-411 | November 6, 2017 |
| Oracle Tuning Pack 19c | TX 8-840-649 | February 21, 2020 |
| Oracle Diagnostics Pack 10g, Release 1 (10.1) | TX 7-912-165 | September 25, 2014 |
| Oracle Diagnostics Pack 10g, Release 2 (10.2) | TX 7-912-163 | September 25, 2014 |
| Oracle Diagnostics Pack 11g, Release 1 (11.1) | TX 7-912-164 | September 25, 2014 |
| Oracle Diagnostics Pack 11g, Release 2 (11.2) | TX 7-912-166 | September 25, 2014 |
| Oracle Diagnostics Pack 12c, Release 1 (12.1) | TX 8-429-412 | November 6, 2017 |
| Oracle Diagnostics Pack 19c | TX 8-844-190 | February 21, 2020 |
| Oracle Partitioning Option for Oracle9i Database, Release 1 (Oracle Partitioning 9.0.1.5.0) | TX 6-493-483 | January 29, 2007 |
| Oracle Partitioning Option for Oracle9i Database, Release 2 (Oracle Partitioning 9.2.0.6.0) | TX 6-498-917 | January 29, 2007 |
| Oracle Partitioning Option to Oracle Database 10g, Release 1 (10.1) | TX 8-377-113 | March 7, 2017 |
| Oracle Partitioning Option to Oracle Database 10g, Release 2 (10.2) | TX 8-377-114 | March 7, 2017 |
| Oracle Partitioning Option to Oracle Database 11g, Release 1 (11.1) | TX 8-377-112 | March 7, 2017 |
| Oracle Partitioning Option to Oracle Database 11g, Release 2 (11.2) | TX 8-377-111 | March 7, 2017 |
| Oracle Partitioning Option to Oracle Database 12c, Release 1 (12.1) | TX 8-377-106 | March 7, 2017 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 9i Release 1 (9.0) | TX 8-188-288 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 9i Release 2 (9.2) | TX 8-188-285 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 10g Release 1 (10.1) | TX 8-188-280 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 10g Release 2 (10.2) | TX 8-188-293 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 11g Release 1 (11.1) | TX 8-188-277 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 11g Release 2 (11.2) | TX 8-188-283 | May 9, 2016 |
| Oracle Real Application Clusters (RAC) Option to Oracle Database 12c Release 1 (12.1) | TX 8-188-275 | May 9, 2016 |
| Oracle Real Application Clusters 19c (19.3) | TX 8-843-144 | February 26, 2020 |

NECAM'S ANSWER AND COUNTERCLAIMS

1      **ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth

2      of the allegations in this paragraph and therefore denies the same

3          40.      As the owner or exclusive licensee of the copyrights in the Oracle Database and the

4      Database Options and Packs, Oracle enjoys the exclusive right to, among other things, reproduce,

5      make derivative works of, display, and distribute the Oracle Database and the Database Options and

6      Packs.  17 U.S.C. §§ 101, 106.

7          **ANSWER:** NECAM lacks knowledge or information sufficient to form a belief as to the truth

8      of the allegations in this paragraph and therefore denies the same.

9          41.      NECAM is not authorized to reproduce, distribute, make derivative works from,

10     and/or display the Oracle Database or the Database Options and Packs, except as authorized by the

11     OPN Agreement and its existing distribution agreements described above.

12         **ANSWER**: Denied.

13         42.      Through the acts described above, NECAM has violated Oracle's exclusive rights to

14     reproduce, distribute, make derivative works from, and/or display the Oracle Database software and

15     the Database Options and Packs software.  On information and belief, NECAM has reproduced,

16     distributed, made derivative works from, and/or displayed the Oracle Database and the Database

17     Options and Packs software in its on-premise environments outside the scope any existing license.

18         **ANSWER**: Denied.

19         43.      As a long-time member of the Oracle Partner Network and Oracle software licensee,

20     NECAM has been, or should have been, aware of the existence of Oracle's copyrights in the Oracle

21     Database and the Database Options and Packs. On information and belief, NECAM also knew it did

22     not have the appropriate license or authorization to distribute and use the Oracle Database or the

23     Database Options beyond the uses for which it had a license. When Oracle brought the unauthorized

24     use to NECAM's attention, NECAM declined to procure the necessary licenses and continued to

25     infringe Oracle's rights in its copyrighted software. NECAM is therefore a willful infringer of

26     Oracle's copyrights and exclusive rights and subject to treble damages.

27         **ANSWER**: Denied.

28

44.     Oracle has been damaged as a result of NECAM's copyright infringement, based on at least NECAM's failure to pay license, maintenance, and support fees related to its use of the Oracle Database and the Database Options and Packs beyond that for which NECAM has a license. Further, on information and belief, NECAM has generated profits through its unauthorized use of the Oracle Database. Oracle is entitled to recover from NECAM the profits NECAM generated through its infringement of Oracle's copyrights in the Oracle Database and the Database Options. Finally, Oracle may elect to recover statutory damages.

**ANSWER**: Denied.

## **ORACLE'S PRAYER FOR RELIEF**

NECAM denies all allegations that Oracle International and Oracle America are entitled to any of the relief requested against NECAM in its Prayer for Relief, or any other relief whatsoever.

NECAM'S ANSWER AND COUNTERCLAIMS

## AFFIRMATIVE DEFENSES

1.      NEC Corporation of America ("NECAM") realleges and incorporates herein by reference the foregoing answers to paragraphs 1-44, inclusive, of Oracle's Complaint for Copyright Infringement and Breach of Contract as though set forth in full in these Affirmative Defenses.

## BACKGROUND

2.      NECAM is the principal U.S. subsidiary of NEC Corporation ("NEC"), a multinational information technology and electronics corporation and a leader in the field of information and communications technology. The solutions developed by NEC Corporation have received numerous awards, and it previously received the Platinum Award for Best Biometric Recognition System in the ASTORS Homeland Security Awards Program. NEC is the provider of more than 1,000 public safety systems globally.

3.      One of the NEC solutions offered by NECAM in the United States is Integra-ID, NEC's flagship multimodal biometrics identification system that incorporates NEC's latest biometric matching algorithms with service-oriented architecture to deliver a comprehensive commercial off-the-shelf solution that provides ready access to varied modalities in identification management, including fingerprint, palmprint, face, voice and iris matching capabilities. Various law enforcement agencies across the United States relies on NECAM's Integra-ID solution to help maintain public order and safety.

4.      NEC's proprietary Integra-ID solution is capable of working with any database, including Oracle's database management software.

5.      Oracle offers three types of software license with varying levels of restriction.

6.      Oracle's Full Use license is the least restrictive license type. According to Oracle's own marketing materials, the Full Use license comes "without restrictions and allows usage that is full functionality."

7.      Oracle's Application Specific Full Use ("ASFU") license is more restrictive. According to Oracle's own marketing materials, the ASFU license "is specific to run only with the defined application and may come with additional restrictions."

8.      Oracle's most restrictive license type is the Embedded license. According to Oracle's own marketing materials, the Embedded License "is limited to embed Oracle technology with defined application and has further restrictions on install, package, configure and access."

9.      The license fees charged by Oracle vary according to the type of license. In general, the fees charged by Oracle are lower for a more restrictive license and higher for a less restrictive license. The most expensive license carrying the highest fees is the Full Use license with no restrictions. The least expensive license carrying the lowest fees is the Embedded license with the most restrictions. On information and belief, Oracle sets exorbitant list prices for licensing its software with no expectations that any of its partners or customers would pay the list fees. Instead, Oracle heavily discounts its list license fees, where the volume of discount generally falls into the following ranges: 65% to 82% (or greater) discount off list price for a Full Use license; 69% to 84% (or greater) discount off list price for an ASFU license; and 90% (or greater) discount off list price for an Embedded license. The Embedded license, again, is the license containing the most restrictions. These discounting practices are especially harmful to NECAM within the context of Oracle's predatory business strategy and unfair trade practice known as "Audit, Bargain, Close," or "ABC," described in detail below, given the financial leverage created among five of NECAM's sublicensee customers deployed with greater than one million dollars ($1,000,000) of list license volume of Oracle Enterprise Database software. On information and belief, Oracle uses its exorbitant list price and discounting practices to unfairly influence negotiated outcomes, disrupt its customers' and partners' business strategies, and inflate commercial outcomes.

10.      Before settling on pairing its Integra-ID solution with Oracle's database management software, NECAM discussed with Oracle the appropriate license model for NECAM's distribution of Oracle's software. As a part of those discussions, NECAM completed and submitted to Oracle multiple registration forms.

11.      In these registration forms, NECAM disclosed to Oracle "We can provide customized reports …" and "The application … uses the Tuning Pack to identify and resolve performance problems …" After receiving these disclosures, Oracle directed NECAM to reinterpret question G10 as asking whether NECAM customized installations, which NECAM does not. Oracle then informed

NECAM that it should distribute Oracle's database management software using the Embedded license. In addition, the terms of the Embedded license prohibited NECAM from distributing Oracle software under any other agreement: "You may not distribute the programs … in any manner except as provided under this agreement and any distribution addenda to this agreement" (see, e.g., Section C of December 11, 2013 Oracle Partner Network ISV Master Distribution Agreement ("MDA")).

12.     Oracle's allegations against NECAM pertain to NECAM's license and use of Oracle database management software since 2017. The bulk of these allegations pertain to NECAM providing "customized reports." Reduced to its core, Oracle's claim is that NECAM should have distributed Oracle software under the less restrictive ASFU license, instead of the more restrictive Embedded license.  However, it is the Embedded license type that Oracle recommended when the parties first engaged in their business discussions around NECAM's plans for its Integra ID solution, and when Oracle was pitching for NECAM's business. In short, Oracle is alleging non-compliance based on the types of activities that NECAM told Oracle it intended to engage in before the parties entered into the Embedded license.

13.     In a letter dated April 1, 2021, Oracle acknowledged that it "does not dispute that NECAM disclosed that its application package would include customized reports" and that it "does not dispute that NECAM disclosed that its application, among other things, would use Oracle Tuning Pack to identify and resolve performance problems." In that same letter, Oracle admits that the Embedded license "allows for a partner to distribute an application that includes prepackaged, as well as ad hoc, reports." Nevertheless, Oracle then argues that ad hoc customization of reports by NECAM and NECAM customers triggers a violation of the Embedded license.

14.     At the time it entered into the Embedded license NECAM was a platinum partner of the Oracle Partner Network. As a platinum partner NECAM trusted and relied on Oracle's representations—including Oracle's direction that NECAM distribute Integra-ID solution with Oracle's database management software using the Embedded license type. That trust and reliance led NECAM to pair its Integra-ID solution with Oracle's database management software, rather than the database management software of a competing vendor.

15.     Had Oracle not recommended that NECAM distribute its Integra-ID solution under an Embedded Oracle license, NECAM would not have chosen this license type. In short, Oracle is seeking to penalize NECAM and has terminated its licenses based on the very conduct that Oracle knew of and specifically approved prior to the parties entering into the contract.

16.     On information and belief, Oracle intentionally directed NECAM to license the software under an Embedded license model because it intended all along to audit NECAM down the road and claim huge licensing penalties. In fact, if Oracle is correct about the limits contained in the Embedded license, then as a practical matter Oracle will be able to allege non-compliance against virtually any licensee using an Embedded license. On information and belief, Oracle's audit arm, Global License & Advisory Services ("GLAS"), acts at the direction of Oracle Sales, and generates significant revenues for Oracle through its claims that a licensee is not complying with the terms of the Embedded license.  On information and belief, such audit claims form a material part of the revenues that Oracle generates from its audit arm and Oracle is incented to push licensees into the more restrictive license in order to claim large audit penalties in subsequent audits.

17.     On information and belief, to incentivize companies to adopt the Embedded license, Oracle not only provides the most significant discount to this license category, but it also gives its sales teams a financial incentive to push the Embedded license to Oracle customers.

18.     On information and belief, for years Oracle has incentivized its salespeople to sell and sign clients to the most restrictive type of license, the Embedded license, while disincentivizing its salespeople from selling and signing clients to the less restrictive ASFU license. On information and belief, Oracle incentivized the sale of the Embedded license by offering its salespeople a commission on license fees generated anywhere in the world under the Embedded license. By contrast and on further information and belief, Oracle disincentivized the sale of other licenses by restricting commissions on ASFU and Full Use licenses to license fees generated only within a salesperson's assigned territory.

19.     On information and belief, because territorial restrictions on commissions did not apply to the sale of Embedded licenses, it was far more lucrative for an Oracle salesperson to sell and sign a client to an Embedded license rather than an ASFU license. This compensation scheme

incentivized Oracle salespeople to push Oracle customers to purchase an Embedded license over other license types in order to earn higher commissions. For clarity, higher commissions were the result of revenue recognition accruing to the sales team local to NECAM for use of an Embedded license and not distributed to the sales teams among end-user sublicensee customers as in the case of an ASFU license. On information and belief, the Oracle sales team negotiating with NECAM intentionally and fraudulently represented to NECAM that the Embedded license would be sufficient for NECAM's proposed use in order to receive a higher commission on the license sale.

20.     On information and belief, the long-standing territorial restrictions on commissions motivating ESL were changed in an around 2020 to motivate Oracle salespeople to push ASFU licenses. Salespeople once motivated to push Embedded licenses knowing that Embedded licenses were not appropriate to begin with were then incentivized to sign current customers to new ASFU licenses, knowing that quota retirement would now be accrued to the local sales team rather than the sales teams associated with the end-user sublicensee customers. On information and belief, NECAM expects Oracle to perpetrate this predatory and unfair business practice on other partners currently distributing Oracle software under existing Embedded software licenses.

21.     In addition, and on information and belief, Oracle intentionally created these incentives to push clients toward the most restrictive Embedded license (even though an ASFU license would theoretically generate higher revenues at the time of license execution) in order to collect penalties for violations of the license restrictions and coerce additional purchases of services, subscriptions, or licenses arising out of Oracle's predatory audits. On information and belief, Oracle Sales intentionally pushed NECAM towards the most restrictive Embedded license with the expectation that NECAM would violate the restrictions of the license, which would provide Oracle with a basis to demand payments of list prices to resolve the audit, or face license termination. On further information and belief, NECAM does not believe that it is the only customer that Oracle has treated this way. On information and belief, Oracle routinely induces companies to adopt the Embedded license with the expectation that it can subsequently allege non-compliance with the restrictions during a future software audit to maximize its profits.

## FIRST AFFIRMATIVE DEFENSE

### Contractual Limitations on Recovery

22.     NECAM realleges and incorporates herein by reference paragraphs 1-21, inclusive, under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in this First Affirmative Defense.

23.     Oracle is barred by the terms of its agreements with NEC from seeking relief and recovering damages for all or part of the claims asserted by Oracle in this action.

24.     By way of example, Section Q4 of the Oracle Partner Network ISV Master Distribution Agreement dated December 11, 2013 ("MDA") prohibits either party from bringing an action "arising or relating to this agreement . . . more than two years after the cause of action has accrued." The only exceptions to this Oracle-mandated limitation period are "actions for nonpayment or breach of Oracle's proprietary rights." Neither of these exceptions apply as NECAM has paid for its distributions, and those distributions were made pursuant to the license rights conveyed by Oracle.

25.     The two-year contractually-imposed limitations period is particularly important in the context of the MDA because Section Q5 of the MDA, which provides for Oracle's audit rights, is not limited in time. Without the two-year contractually-imposed limitations period, Oracle's audits would not have any meaningful or reasonable limits.

26.     As another example, Section Q5 of the MDA sets forth the exclusive remedies that are available to Oracle in the event that Oracle terminates the MDA. That list (prepared by Oracle) does not include payment.

27.     As a further example, the license addendum on which Oracle relies for its alleged non-compliance claims states, in the second sentence of Section 1(ii), "You **may** not customize the application package for a single end user or a group of end users." (*See, e.g.*, Embedded Software License Distribution Addendum to the Oracle Partner Network ISV Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc., attached as **Exhibit D** ("ESL Addendum") (emphasis added).) In other portions of the ESL Addendum, including in Section 1(ii), Oracle used the term "must" when conveying a legal obligation: e.g., "The application program must be designed and developed by you to eliminate program administration tasks by the end user by

including all program administration functions within the application program." *Id*. On information and belief, Oracle intentionally used the word "may" rather than "must" because it was not conveying a legal obligation. As Oracle admits in its letter of April 1, 2021, "Oracle does not disagree that 'may' and 'shall' have different legal definitions and that 'may' is permissive." (*See* **Exhibit C**.)

28.     Because of the two-year contractual limitations period Oracle is prohibited from seeking recovery for acts that occurred more than two years before the filing date of Oracle's complaint; because Section Q5 of the MDA provides an exhaustive list of remedies in the event of termination by Oracle, it can no longer seek monetary recovery from NECAM; and because Oracle chose to use the word "may" rather than "must" in the ESL Addendum, it cannot now allege the agreement prohibits customizing the application package for a single end user or a group of end users.

## SECOND AFFIRMATIVE DEFENSE

### Breach of Implied Covenant of Good Faith and Fair Dealing

29.     NECAM realleges and incorporates herein by reference paragraphs 1-28, inclusive, under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in this Second Affirmative Defense.

30.     The conduct of Oracle described in the foregoing paragraphs demonstrates that Oracle failed to act fairly and in good faith in negotiating a software license with NECAM and in its conduct under the agreements with NECAM. Such conduct may be summarized, without limitation, as follows.

31.     On information and belief, Oracle offers its sales team monetary incentives and pushes it customers to purchase the most restrictive type of license, the Embedded license, as part of an unfair and predatory business strategy and pattern of unfair trade practices called "Audit, Bargain, Close," or "ABC." On information and belief, as part of the ABC strategy, Oracle pushes clients to purchase the Embedded license with the expectation that the client's intended use of the Oracle software would violate the restrictions of the Embedded license so that Oracle may later audit the client's operations and demand unreasonable and exorbitant penalties when the expected violations are found by Oracle's auditors.

32.     On information and belief, Oracle pursued the ABC strategy against NECAM. On information and belief, Oracle sold NECAM the most restrictive type of license, the Embedded license, having the expectation that NECAM's intended use would violate the restrictions of the Embedded license. NECAM completed and submitted registration forms to Oracle that disclosed NECAM's intended use of the Oracle software. On information and belief, Oracle expected that such use would violate the restrictions of the Embedded license. Oracle even directed NECAM to reinterpret at least one key question on the registration form such that NECAM's disclosure would be revised so that NECAM could qualify for the Embedded license. Oracle then directed NECAM to sublicense Oracle software using the Embedded license and waited years before auditing NECAM's operations. Once the audit was underway Oracle ignored its directions and representations to NECAM, ignored terms such as the contractually-imposed 2-year limitations period, unilaterally construed ambiguities in the Oracle agreements against NECAM, and asserted claims against NECAM based on Oracle's list price and demanded unreasonable and exorbitant penalties from NECAM for the issues that NECAM disclosed to Oracle in advance of entering into the license. When NECAM rightly pointed out Oracle's predatory conduct, Oracle threatened to and then did terminate NECAM's license.  On information and belief, Oracle routinely uses threats of license termination and actual license terminations to force Oracle customers to capitulate to Oracle's inflated monetary demands arising out of its predatory audits.

33.     The foregoing conduct, Oracle's refusal to take responsibility for directing NECAM to sublicense Oracle software using the Embedded license, Oracle's decision to ignore unfavorable contract terms, and its insistence on rewriting its own agreement (e.g., claiming that "may not" means "must not") are all examples of Oracle's failure to act fairly and in good faith.

## THIRD AFFIRMATIVE DEFENSE

### Fraud in the Inducement / Fraud in the Execution

34.     NECAM realleges and incorporates herein by reference paragraphs 1-33, inclusive, under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in this Third Affirmative Defense.

35.     The conduct of Oracle described in the foregoing paragraphs demonstrates that Oracle procured through fraud NECAM's agreement to use and distribute Oracle's software with NECAM's own Integra-ID software. Oracle's fraudulent conduct is already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein. Such conduct may be summarized, without limitation, as follows.

36.     Oracle misrepresented the compatibility of the Embedded license with NECAM's intended use of the Oracle software. Oracle falsely represented that the Embedded license type would authorize NECAM to use Oracle's software as NECAM intended. In order to apply for a license to Oracle's software, NECAM was required to complete an Oracle registration form, and Oracle selected and provided the Embedded Software License Application Package Registration Form to NECAM. In the registration form, NECAM disclosed to Oracle its intended use of the Oracle software. After receiving this disclosure, Oracle continued to push NECAM to purchase the Embedded license rather than any less restrictive license Oracle offered. Oracle's salespeople even advised NECAM to revise its registration form to qualify for the Embedded license. Oracle issued the Embedded license to NECAM and directed NECAM to sublicense the Oracle software only using the Embedded license structure. Oracle now characterizes NECAM's use of the Oracle software – the exact same use previously disclosed to Oracle – as a violation of the restrictions of the Embedded license.

37.     On information and belief, Oracle knew that NECAM's intended use of the Oracle software would violate the restrictions of Oracle's Embedded license. In response to question G10 on Oracle's Embedded Software License Application Package Registration Form, NECAM advised Oracle that NECAM's software, in which the Oracle software would be embedded, "can provide customized reports." Oracle then instructed NECAM to reinterpret the questions on the Embedded license registration form as asking whether NECAM customized software installations. Because NECAM does not customize software installations, its answer to question G10 changed to a "no." On information and belief, that answer paved the way to Oracle issuing the Embedded license to NECAM. After NECAM updated its responses to the registration form based on Oracle's guidance, Oracle granted NECAM an Embedded license to use Oracle's software. On information and belief,

Oracle instructed NECAM to reinterpret the question because NECAM's prior answer disclosed a use that was incompatible with the Embedded license.

38.     On information and belief, Oracle has implemented an audit strategy and unfair trade practice known as "Audit, Bargain, Close," or "ABC." Oracle's ABC audit scheme has been widely reported in the business press and is the subject of serval securities class action lawsuits currently pending in the Northern District of California. Essentially, Oracle weaponizes its limited audit rights under its license agreements by conducting predatory audits of its customers. On information and belief, Oracle sets traps for unsuspecting customers, lays in wait anticipating that its customers will act in a certain way, and then audits those customers, claiming that the anticipated activity gives rise to numerous and repeated violations of the license agreement and demanding the payment of extraordinary penalties to avoid termination of the license.

39.     For example, on information and belief, Oracle provides its software with restricted features enabled, unlike most software publishers that require license keys to access restricted features. On information and belief, Oracle's customers must independently become aware that these features are enabled, know that those features are restricted under the terms of the license agreement, and take affirmative action to disable those features to prevent Oracle from later claiming large licensing penalties during an audit. On information and belief, Oracle does not inform its customers that it provides its software with restricted features enabled, that those features must be disabled by the customer, or that use of enabled features will be considered a violation of the license agreement and will subject the customer to penalties. On information and belief, Oracle also sets traps in its software to the extent a customer may inadvertently activate a feature without really intending to do so. On information and belief, Oracle creates these circumstances intentionally so that, down the road, during the inevitable audits of its customers, Oracle may claim numerous instances of non-compliance with its license, demand penalties, and sell additional Oracle software licenses.

40.     On information and belief, Oracle also claims during audits that customers must take a license for non-use of Oracle software, such as when customers utilize competing virtualization technology provided by VMware, Inc. ("VMware").

41.     On information and belief, Oracle's sales division works hand-in-glove with the licensing and auditing arm of Oracle's business, known as Global Licensing and Advisory Services ("GLAS") or, formerly, License Management Services ("LMS"). On information and belief, in the typical audit GLAS issues a final audit report with a penalty so massive it is designed to shock and strike fear in even the largest and most sophisticated of Oracle's customers. On information and belief, if the Oracle customer refuses to meet Oracle's exorbitant monetary demands, Oracle then threatens to terminate the license, or actually terminates the license, forcing the customer to choose between paying Oracle additional licensing fees in the form of extortionate "list" prices for a license or other licensing fees or penalties the customer does not owe, discontinuing the customer's business, or facing a suit by Oracle for copyright infringement.

42.     On information and belief, as part of this ABC audit strategy, Oracle devised a compensation scheme that incentivizes its salespeople to sell the Embedded license, Oracle's most restrictive license, instead of other less restrictive license types. On information and belief, Oracle prefers selling the Embedded license because it expects and anticipates that its customers will violate the restrictions of the license, which will allow Oracle to claim large licensing penalties later when the customer is under audit. On information and belief, Oracle expects to generate higher revenues overall by selling the Embedded license and auditing customers than by selling a less restrictive license, even though the fees for the Embedded license are lower at inception than the fees for any of Oracle's less restrictive licenses. On information and belief, Oracle offers these lower prices to win the business and eliminate competitors, all the while knowing it will lay in wait and reap higher profits from the Oracle customer during the inevitable audit. On information and belief, Oracle eventually audits the client's operations, alleges violations of the restrictive Embedded license, and demands payment of an exorbitant and inflated list price – one significantly above market price – for a less restrictive license, or else face license termination.[1]

---

[1]  Oracle is adept at playing the long game with its audits. On information and belief, Oracle will lay the trap for the licensee knowing full well that it won't reap the benefits until further down the road during the next audit. On information and belief, that is why Oracle incentivizes the

43.     On information and belief, Oracle pushes the Embedded license over other licenses, even when a customer discloses information showing that the Embedded license is incompatible with the customer's intended use of the Oracle software. This is exactly what happened to NECAM. Even though NECAM disclosed to Oracle how it intended to use the Oracle software with its Integra-ID 5 application, Oracle pushed NECAM to accept the Embedded license and later audited NECAM, claiming that NECAM's use of the Oracle software – exactly as previously disclosed to Oracle – violated the terms of the Embedded license.

44.     On information and belief, Oracle misrepresented the compatibility of the Embedded license with NECAM's disclosed use in order to persuade NECAM to agree to the Embedded license, so Oracle could eventually claim huge licensing penalties during a later software audit and so the Oracle sales team could earn the higher commissions on the Embedded license.  Oracle pushed NECAM to purchase the most restrictive license Oracle offered, the Embedded license, knowing NECAM's intended use of the Oracle software. Later, Oracle audited NECAM and characterized NECAM's use of the Oracle software – the exact same use previously disclosed to Oracle – as a violation of the Embedded license. Oracle then demanded payment of license fees so far above market that they would have driven NECAM into the arms of a competitor if they had been offered by Oracle's salespeople when NECAM originally sought a license. On information and belief, Oracle planned to audit NECAM and characterize NECAM's use of the Oracle software as a violation of the Embedded software license when Oracle misrepresented the compatibility of the Embedded license with NECAM's intended use of Oracle's software.

45.     Each software license granted by Oracle is "limited to the application package detailed on [an application package registration form] . . . and may not be combined with any additional functionality or additional application programs outside the scope of the Application Package as described [in the form]." (Oracle Embedded Software License Application Package Registration Form at 1.) Additionally, "[a] separate Registration Form is required for each

---

sale of the most restrictive licenses. Oracle is happy to forgo the extra income now, to reap a huge windfall down the road.

NECAM'S ANSWER AND COUNTERCLAIMS

Application Package that is functionally unique." (Oracle Embedded Software License Application Package Registration Form at 1.) In other words, despite having a master distribution agreement with Oracle, each new application package developed by NECAM requires a new software license from Oracle for NECAM to distribute Oracle's database software with NECAM's new application, and each software license is granted by Oracle only after completion of a new registration form for that software package. Additionally, the scope of the license granted by Oracle will depend on the information disclosed by NECAM on Oracle's registration form for a particular software package.

46.     In early 2016, NECAM had an existing master distribution agreement with Oracle and approached Oracle to obtain a new software license addendum, as required by Oracle, to distribute Oracle database software with NECAM's Integra ID-5 application. After discussions with Oracle salespeople, NECAM completed Oracle's Embedded Software License (ESL) Application Package Registration Form (APRF) describing NECAM's Integra ID-5 application and the planned distribution and use of the Oracle database with the Integra ID-5 application. By email on March 29, 2016, Bruce Montgomery, Senior Purchasing Manager at NECAM, transmitted a PDF of the completed ESL APRF to Raj Thakuria at Oracle. The completed ESL APRF was signed by Yvonne Taylor, Director of Procurement at NECAM. The signed ESL APRF attached to Bruce Montgomery's email stated in response to question G10: "We [NECAM's Integra-ID 5] can provide customized reports, but End User is not able to navigate the underlying data or logical schema," i.e., the Oracle database.

47.     On December 7, 2016, Allison Bell, ISV Account Manager for Oracle, informed Oliver Fish, a Senior Vendor Relations Specialist at NECAM, by email that the "first draft [of the ESL APRF] was rejected." In that email, Allison Bell requested additional input from NECAM via email and offered that "I [Allison Bell] will make the appropriate changes and resubmit." Alan Reynolds at Oracle was copied on this email communication.

48.     On December 19, 2016, Oliver Fish forwarded an email thread to Allison Bell and Alan Reynolds at Oracle with the subject line "Oracle Usage and Licensing." On information and belief, this email thread provided the additional input requested by Allison Bell. In the body of the email, Oliver Fish stated: "See below and let me know if this information can be utilized." The

NECAM'S ANSWER AND COUNTERCLAIMS

email thread below Oliver Fish's email disclosed the following additional details about NECAM's planned use of the Oracle database with NECAM's Integra ID-5 application: "Oracle is included and installed as part [of] our application. We launch a standard set of scripts as part of application installation, but it is also configured through our application interface."

49.     Allison Bell responded to Oliver Fish by email on December 20, 2016. In that email, Allison Bell states: "I will try to resubmit [the ESL APRF] with the below information." (The term "below information" in Allison Bell's email referred to the information provided in the email thread forwarded by Oliver Fish the day before (December 19).) Allison Bell's email on December 20 also indicated she was seeking "final approvals" within Oracle for a draft of the ESL APRF.

50.     On information and belief, Allison Bell and others on the Oracle sales team actively sought or promoted revisions to the ESL APRF that would qualify customers, like NECAM, for an Embedded license instead of offering a different license type. On information and belief, Oracle incentivized this behavior through a coercive compensation scheme in order to enhance revenues through its Audit, Bargain, Close tactics.

51.     Despite knowing that NECAM's Integra ID-5 application would be able to "provide customized reports" from data retrieved from an Oracle database, Oracle's salespeople continued to push NECAM to accept an Embedded license to the Oracle database. On January 20, 2017, Allison Bell emailed an updated price quote for an Embedded Software License to Oliver Fish. Alan Reynolds at Oracle was copied on this email communication. In the email, Allison Bell stated: "Worked through this proposal a bit more last night, please see attached." Allison Bell also stated that the proposal "might be a bit more clear on the different options and values." The quote was provided in an Excel spreadsheet attached to Allison Bell's email and dated January 19, 2017. The quote was prepared by Allison Bell and Greg Walker, both at Oracle. The only license presented in the quote was an ESL. The "options" presented in the quote were different ways to pay for the ESL: "Pay As You Go" or "2 Year Prepay."

52.     Ultimately, Oracle approved NECAM's ESL APRF as revised by, or revised according to guidance by, Allison Bell at Oracle. The approved ESL APRF was signed by Carlo Lagdamen, Manager of Solution Engineering for NECAM, on March 7, 2017, and transmitted to

Oracle on or about the same date. In response to question G10, the ESL APRF approved by Oracle omits any reference to customized reports and instead incorporates the information first provided to Allison Bell on December 19. The approved response to question G10 states: "End User are not allowed direct access to the database and are provided reports through Integra-ID 5 application only. The application makes configuration changes to the database, however [*sic*] we launch the install manually using standard scripts. We prepare the initial database and then install the NEC application which can then make configuration changes to the database. The database does not install through our installer. It is not a customized install however, [*sic*] it installs from disk and is configured via the standard application."

53.     On March 8, 2017, the revised ESL APRF was countersigned by Dennis Cartey, Deal Specialist for Oracle America, Inc.

54.     Subsequently, Oracle and NECAM executed an Embedded Software License Distribution Addendum to the Oracle PartnerNetwork Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. The addendum expressly prevents NECAM from distributing the Oracle database under any other software license type offered by Oracle. Section 1(x) states: "The application program(s) described on the applicable application package registration form and with which the programs are embedded must not be distributed under any other Oracle distribution agreement."

55.     Aware of NECAM's intended use of the Oracle software, Oracle granted NECAM a license knowing that the restrictions present in the Embedded license type selected by Oracle would not permit NECAM to use the Oracle software as it intended. In other words, Oracle promised to authorize NECAM's use of the Oracle software without ever intending to honor that promise.

56.     NECAM relied on the selection of the Embedded license type by Oracle's salespeople and the false representation that the Embedded license would authorize NECAM's intended use of the Oracle software. NECAM's reliance was reasonable given that NECAM was required to submit a registration form, NECAM disclosed the intended use of Oracle's software in that registration form, and Oracle continued to push NECAM to take the Embedded license.

57.     Absent Oracle's misrepresentation, NECAM would have selected a less restrictive license structure or pursued a license to database software from another vendor.  NECAM has been damaged by Oracle's fraud and misrepresentations.

## FOURTH AFFIRMATIVE DEFENSE

### Copyright Misuse

58.     NECAM realleges and incorporates herein by reference paragraphs 1-57, inclusive, under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in this Fourth Affirmative Defense.

### A. Preventing Customized Reports

59.     Oracle has committed copyright misuse through its practice of pushing the Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from delivering the full features available in NEC's own software, over which Oracle has no claim of copyright.

60.     NECAM's software includes a feature that allows for customization of reports presented to the end user. NECAM may also customize its software to generate reports according to an end user's requirements. The customization of NECAM's software and the ability to generate customized reports are features developed entirely by NECAM without any contribution or involvement by Oracle. Oracle's software retrieves information from a database, but it is NECAM's software that determines what information is needed and how that information should be reported to the end user. Oracle's Embedded license seeks to prevent NECAM from delivering the full functionality of NECAM's own software, over which Oracle has no claim of copyright. And Oracle also has no ownership claims over the data that is stored in Oracle's database. This is copyright misuse because it attempts to enlarge the scope of the monopoly protected by Oracle's copyright, it frustrates the purpose of copyright by stifling innovation by NECAM, and through restrictions such as these Oracle is essentially interfering with its partners' (or customers') ability to use their own copyrighted works and data.

**B. Preventing Application Customization and Development**

61.     Oracle has committed copyright misuse through its practice of pushing the
Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these
practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from modifying
NEC's own software, over which Oracle has no claim of copyright.

62.     In letters addressing Oracle's audit findings, Oracle complains that "NECAM
customizes its application for each of its end users, which is a further violation of the ESL
Addendum." Oracle also complains that "NEC installs feature updates and bug fixes in the end
user's systems, on their behalf." Here, Oracle is attempting to prohibit NECAM from modifying
and updating NECAM's own software – a software developed without any contribution or
involvement by Oracle and over which Oracle has no claim of copyright. This is another instance of
copyright misuse because it attempts to enlarge the scope of the monopoly protected by Oracle's
copyright, and it frustrates the purpose of copyright by stifling innovation by NECAM.

**C. Preventing Remote Maintenance and Support of NECAM Software**

63.     Oracle has committed copyright misuse through its practice of pushing the
Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these
practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from providing
support services for NEC's own software, over which Oracle has no claim of copyright.

64.     In Oracle's letter to NECAM dated April 1, 2021, Oracle complains that "NEC
installs feature updates and bug fixes in the end user's systems, on their behalf." Here, Oracle is
attempting to prevent NECAM from developing and deploying new features and bug fixes in
NECAM's own software, over which Oracle has no claim of copyright. Oracle also complains that
Oracle provides "monitoring and incident notification for networks and wireless devices, servers,
applications, and IP telephony platforms" as well as "support services including configuration
management, trend analysis, and dedicated support resources." Here, Oracle is attempting to
prevent NECAM from offering support services to customers of NECAM's own software, over
which Oracle has no claim of copyright. This is yet another instance of copyright misuse because it

1    attempts to enlarge the scope of the monopoly protected by Oracle's copyright, and it frustrates the

2    purpose of copyright by stifling innovation by NECAM.

3                              **FIFTH AFFIRMATIVE DEFENSE**

4                              **License – Express or Implied**

5           65.    NECAM realleges and incorporates herein by reference paragraphs 1-64, inclusive,

6    under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in

7    this Fifth Affirmative Defense.

8           66.    NECAM's use of the Oracle software, which Oracle characterizes as a violation of

9    the Embedded license granted to NECAM and as copyright infringement, was and continues to be

10   authorized by the express terms of the agreement between Oracle and NECAM. In the alternative,

11   NECAM's use of the Oracle software, which Oracle characterizes as a violation of the Embedded

12   license granted to NECAM and as copyright infringement, was and continues to be authorized by an

13   implied license because Oracle granted the Embedded license to NECAM after NECAM applied for

14   a license to Oracle's software and, at Oracle's request, disclosed its intended use for the Oracle

15   software.

16          67.    In either event, Oracle did not have the right to demand payment of fees or penalties

17   for such use under an audit, and Oracle did not have the right to terminate its agreement with

18   NECAM. Oracle's purported termination was ineffective, and Oracle's agreement with NECAM

19   authorizing NECAM's use of the Oracle software continues in full force and effect.

20                             **SIXTH AFFIRMATIVE DEFENSE**

21                        **Equitable Estoppel and/or Unclean Hands**

22          68.    NECAM realleges and incorporates herein by reference paragraphs 1-67, inclusive,

23   under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in

24   this Sixth Affirmative Defense.

25          69.    Based on the conduct of Oracle alleged above and incorporated herein by reference,

26   Oracle's causes of action and claims for relief are barred in whole or in part by the doctrines of

27   equitable estoppel and/or unclean hands. Oracle's conduct caused the activity that it now

28

1   characterizes as a violation of the Embedded license granted to NECAM and as copyright

2   infringement.

3       70.     Through its conduct, Oracle misrepresented the Embedded license as being

4   appropriate for NECAM's planned use of the Oracle software. Oracle initially selected the

5   Embedded license and asked NECAM to apply for the Embedded license by completing the

6   Embedded Software License Application Package Registration Form. That registration form

7   presented questions seeking details about the features of the NECAM software (Integra-ID) that

8   would be paired with Oracle's software. In responding to these questions, NECAM disclosed its

9   planned use of the Oracle software – the same use about which Oracle now complains. Knowing

10  NECAM's planned use of the Oracle software, Oracle continued to promote, and ultimately

11  granted, an Embedded license to NECAM.

12      71.     Oracle knew NECAM's planned use of the Oracle software, granted the Embedded

13  license as if it were sufficient to authorized NECAM's planned use, and intended for NECAM to

14  use the Oracle software as planned so that Oracle could later audit NECAM and claim violations of

15  the Embedded license agreement. Oracle's conduct lead directly to its allegations of injury and

16  claims for relief in this action.

17                          **SEVENTH AFFIRMATIVE DEFENSE**

18                                    **Mistake**

19      72.     NECAM realleges and incorporates herein by reference paragraphs 1-71, inclusive,

20  under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in

21  this Seventh Affirmative Defense.

22      73.     Oracle misrepresented the Embedded license as being appropriate for NECAM's

23  planned use of the Oracle software. Oracle initially selected the Embedded license and asked

24  NECAM to apply for the Embedded license by completing the Embedded Software License

25  Application Package Registration Form. That registration form presented questions seeking details

26  about the features of the NECAM software (Integra-ID) that would be paired with Oracle's

27  software. In responding to these questions, NECAM disclosed its planned use of the Oracle

28  software – the same use about which Oracle now complains. Knowing NECAM's planned use of

NECAM'S ANSWER AND COUNTERCLAIMS

the Oracle software, Oracle continued to promote, and ultimately granted, an Embedded license to NECAM.

74.     Because of Oracle's conduct and its misrepresentation of the Embedded license as being appropriate for NECAM's planned use of the Oracle software, NECAM was mistaken that the Embedded license authorized NECAM's use of the Oracle software as planned. If Oracle had correctly represented the scope of the Embedded license, NECAM would never have accepted the Embedded license and would not be subject to Oracle's extortionate audit demands.

## EIGHTH AFFIRMATIVE DEFENSE

### Failure to Mitigate Damages

75.     NECAM realleges and incorporates herein by reference paragraphs 1-74, inclusive, under the heading of "Affirmative Defenses" and related subheadings as though set forth in full in this Eighth Affirmative Defense.

76.     Oracle granted an Embedded license to NECAM knowing NECAM's planned use of the Oracle software and with the expectation that it would audit NECAM and characterize that same use as a violation of the Embedded license. Oracle then laid in wait for nearly four years to allow numerous alleged violations to accrue.

77.     Oracle failed to mitigate damages in at least the following manners. Knowing NECAM's planned use of the Oracle software, Oracle failed to offer a compatible license and thereby mitigate the amount of injury and damages Oracle now claims. Oracle also failed to audit NECAM in a timely fashion and thereby mitigate the amount of injury and damages Oracle now claims.

NECAM'S ANSWER AND COUNTERCLAIMS

## COUNTERCLAIMS

NEC Corporation of America ("NECAM") hereby asserts the following counterclaims against Oracle America, Inc. ("Oracle America") and Oracle International Corporation ("Oracle International") (together "Oracle"). NECAM reserves the right to assert additional counterclaims as warranted by the facts revealed through discovery.

## PARTIES

1.      NEC Corporation of America ("NECAM") is a corporation organized under the laws of the State of Nevada with its headquarters and principal place of business at 3929 W John Carpenter Freeway, Irving, Texas, 75063. NECAM is a subsidiary of NEC Corporation, a Japanese multinational information technology company headquartered in Minato, Tokyo, Japan.

2.      Upon information and belief, Oracle America, Inc. ("Oracle America") is a corporation organized under the laws of the State of Delaware with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065.

3.      Upon information and belief, Oracle International Corporation ("Oracle International") is a corporation organized under the laws of the State of California with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367.

5.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different States.

6.      This Court has personal jurisdiction over Oracle America and Oracle International because Oracle America and Oracle International filed this action and submitted to the jurisdiction of this Court. In addition, Oracle America and Oracle International conduct substantial business in the United States, and in the State of California and the Northern District of California. The claims arise from Oracle America and Oracle International's actions substantially occurring in the state of California.

7.      Venue is proper in this district because Oracle America and Oracle International filed this action and alleged that venue is proper in this district. In addition, Oracle America and Oracle International have also consented to the exclusive jurisdiction of, and venue in, the courts in San Francisco and Santa Clara counties in California, in any disputes arising out of or relating to the Oracle PartnerNetwork Agreement ("OPN Agreement") and the related Master Distribution Agreement ("MDA") between NECAM and Oracle America, and this is such a dispute. *See* 2018 MDA § Q(1) ("This Agreement is governed by the substantive and procedural laws of the State of California and you and Oracle agree to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California, in any dispute arising out of or relating to this agreement."); 2020 OPN Agreement § W(1) ("This agreement is governed by the substantive and procedural laws of the State of California and you and Oracle agree to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California in any disputes arising out of or relating to this agreement.").

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1400(a), as Oracle America and Oracle International are subject to personal jurisdiction within this district. Venue is further proper in this District, as Oracle America and Oracle International have consented to venue here, as discussed above.

## FIRST COUNTERCLAIM

### Intentional Misrepresentation and / or False Promise

9.      NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-8, inclusive, of these Counterclaims.

10.     The conduct of Oracle described in the foregoing paragraphs demonstrates that Oracle procured through fraud NECAM's agreement to use and distribute Oracle's software with NECAM's own Integra-ID software. Oracle's fraudulent conduct is already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein. Such conduct may be summarized, without limitation, as follows.

11.      Oracle misrepresented the compatibility of the Embedded license with NECAM's intended use of the Oracle software. Oracle falsely represented that the Embedded license type would authorize NECAM to use Oracle's software as NECAM intended. In order to apply for a license to Oracle's software, NECAM was required to complete an Oracle registration form, and Oracle selected and provided the Embedded Software License Application Package Registration Form to NECAM. In the registration form, NECAM disclosed to Oracle its intended use of the Oracle software. After receiving this disclosure, Oracle continued to push NECAM to purchase the Embedded license rather than any less restrictive license Oracle offered. Oracle's salespeople even advised NECAM to revise its registration form to qualify for the Embedded license. Oracle issued the Embedded license to NECAM and directed NECAM to sublicense the Oracle software only using the Embedded license structure. Oracle now characterizes NECAM's use of the Oracle software – the exact same use previously disclosed to Oracle – as a violation of the restrictions of the Embedded license.

12.      On information and belief, Oracle knew that NECAM's intended use of the Oracle software would violate the restrictions of Oracle's Embedded license. In response to question G10 on Oracle's Embedded Software License Application Package Registration Form, NECAM advised Oracle that NECAM's software, in which the Oracle software would be embedded, "can provide customized reports." Oracle then instructed NECAM to reinterpret the questions on the Embedded license registration form as asking whether NECAM customized software installations. Because NECAM does not customize software installations, its answer to question G10 changed to a "no." On information and belief, that answer paved the way to Oracle issuing the Embedded license to NECAM. After NECAM updated its responses to the registration form based on Oracle's guidance, Oracle granted NECAM an Embedded license to use Oracle's software. On information and belief, Oracle instructed NECAM to reinterpret the question because NECAM's prior answer disclosed a use that was incompatible with the Embedded license.

13.      On information and belief, Oracle has implemented an audit strategy and unfair trade practice known as "Audit, Bargain, Close," or "ABC." Oracle's ABC audit scheme has been widely reported in the business press and is the subject of serval securities class action lawsuits currently

pending in the Northern District of California. Essentially, Oracle weaponizes its limited audit rights under its license agreements by conducting predatory audits of its customers. On information and belief, Oracle sets traps for unsuspecting customers, lays in wait anticipating that its customers will act in a certain way, and then audits those customers, claiming that the anticipated activity gives rise to numerous and repeated violations of the license agreement and demanding the payment of extraordinary penalties to avoid termination of the license.

14.     For example, on information and belief, Oracle provides its software with restricted features enabled, unlike most software publishers that require license keys to access restricted features. On information and belief, Oracle's customers must independently become aware that these features are enabled, know that those features are restricted under the terms of the license agreement, and take affirmative action to disable those features to prevent Oracle from later claiming large licensing penalties during an audit. On information and belief, Oracle does not inform its customers that it provides its software with restricted features enabled, that those features must be disabled by the customer, or that use of enabled features will be considered a violation of the license agreement and will subject the customer to penalties. On information and belief, Oracle also sets traps in its software to the extent a customer may inadvertently activate a feature without really intending to do so. On information and belief, Oracle creates these circumstances intentionally so that, down the road, during the inevitable audits of its customers, Oracle may claim numerous instances of non-compliance with its license, demand penalties, and sell additional Oracle software licenses.

15.     On information and belief, Oracle also claims during audits that customers must take a license for non-use of Oracle software, such as when customers utilize competing virtualization technology provided by VMware.

16.     On information and belief, Oracle's sales division works hand-in-glove with the licensing and auditing arm of Oracle's business, known as Global Licensing and Advisory Services ("GLAS") or, formerly, License Management Services ("LMS"). On information and belief, in the typical audit GLAS issues a final audit report with a penalty so massive it is designed to shock and strike fear in even the largest and most sophisticated of Oracle's customers. On information and

belief, if the Oracle customer refuses to meet Oracle's exorbitant monetary demands, Oracle then threatens to terminate the license, or actually terminates the license, forcing the customer to choose between paying Oracle additional licensing fees in the form of extortionate "list" prices for a license or other licensing fees or penalties the customer does not owe, discontinuing the customer's business, or facing a suit by Oracle for copyright infringement.

17.     On information and belief, as part of this ABC audit strategy, Oracle devised a compensation scheme that incentivizes its salespeople to sell the Embedded license, Oracle's most restrictive license, instead of other less restrictive license types. On information and belief, Oracle prefers selling the Embedded license because it expects and anticipates that its customers will violate the restrictions of the license, which will allow Oracle to claim large licensing penalties later when the customer is under audit. On information and belief, Oracle expects to generate higher revenues overall by selling the Embedded license and auditing customers than by selling a less restrictive license, even though the fees for the Embedded license are lower at inception than the fees for any of Oracle's less restrictive licenses. On information and belief, Oracle offers these lower prices to win the business and eliminate competitors, all the while knowing it will lay in wait and reap higher profits from the Oracle customer during the inevitable audit. On information and belief, Oracle eventually audits the client's operations, alleges violations of the restrictive Embedded license, and demands payment of an exorbitant and inflated list price – one significantly above market price – for a less restrictive license, or else face license termination.[2]

18.     On information and belief, Oracle pushes the Embedded license over other licenses, even when a customer discloses information showing that the Embedded license is incompatible with the customer's intended use of the Oracle software. This is exactly what happened to NECAM.

_____

[2]   Oracle is adept at playing the long game with its audits. On information and belief, Oracle will lay the trap for the licensee knowing full well that it won't reap the benefits until further down the road during the next audit. On information and belief, that is why Oracle incentivizes the sale of the most restrictive licenses. Oracle is happy to forgo the extra income now, to reap a huge windfall down the road.

Even though NECAM disclosed to Oracle how it intended to use the Oracle software with its Integra-ID 5 application, Oracle pushed NECAM to accept the Embedded license and later audited NECAM, claiming that NECAM's use of the Oracle software – exactly as previously disclosed to Oracle – violated the terms of the Embedded license.

19.     On information and belief, Oracle misrepresented the compatibility of the Embedded license with NECAM's disclosed use in order to persuade NECAM to agree to the Embedded license, so Oracle could eventually claim huge licensing penalties during a later software audit and so the Oracle sales team could earn the higher commissions on the Embedded license.  Oracle pushed NECAM to purchase the most restrictive license Oracle offered, the Embedded license, knowing NECAM's intended use of the Oracle software. Later, Oracle audited NECAM and characterized NECAM's use of the Oracle software – the exact same use previously disclosed to Oracle – as a violation of the Embedded license. Oracle then demanded payment of license fees so far above market that they would have driven NECAM into the arms of a competitor if they had been offered by Oracle's salespeople when NECAM originally sought a license. On information and belief, Oracle planned to audit NECAM and characterize NECAM's use of the Oracle software as a violation of the Embedded software license when Oracle misrepresented the compatibility of the Embedded license with NECAM's intended use of Oracle's software.

20.     Each software license granted by Oracle is "limited to the application package detailed on [an application package registration form] . . . and may not be combined with any additional functionality or additional application programs outside the scope of the Application Package as described [in the form]." (Oracle Embedded Software License Application Package Registration Form at 1.) Additionally, "[a] separate Registration Form is required for each Application Package that is functionally unique." (Oracle Embedded Software License Application Package Registration Form at 1.) In other words, despite having a master distribution agreement with Oracle, each new application package developed by NECAM requires a new software license from Oracle for NECAM to distribute Oracle's database software with NECAM's new application, and each software license is granted by Oracle only after completion of a new registration form for

that software package. Additionally, the scope of the license granted by Oracle will depend on the information disclosed by NECAM on Oracle's registration form for a particular software package.

21.     In early 2016, NECAM had an existing master distribution agreement with Oracle and approached Oracle to obtain a new software license addendum, as required by Oracle, to distribute Oracle database software with NECAM's Integra ID-5 application. After discussions with Oracle salespeople, NECAM completed Oracle's Embedded Software License (ESL) Application Package Registration Form (APRF) describing NECAM's Integra ID-5 application and the planned distribution and use of the Oracle database with the Integra ID-5 application. By email on March 29, 2016, Bruce Montgomery, Senior Purchasing Manager at NECAM, transmitted a PDF of the completed ESL APRF to Raj Thakuria at Oracle. The completed ESL APRF was signed by Yvonne Taylor, Director of Procurement at NECAM. The signed ESL APRF attached to Bruce Montgomery's email stated in response to question G10: "We [NECAM's Integra-ID 5] can provide customized reports, but End User is not able to navigate the underlying data or logical schema," i.e., the Oracle database.

22.     On December 7, 2016, Allison Bell, ISV Account Manager for Oracle, informed Oliver Fish, a Senior Vendor Relations Specialist at NECAM, by email that the "first draft [of the ESL APRF] was rejected." In that email, Allison Bell requested additional input from NECAM via email and offered that "I [Allison Bell] will make the appropriate changes and resubmit." Alan Reynolds at Oracle was copied on this email communication.

23.     On December 19, 2016, Oliver Fish forwarded an email thread to Allison Bell and Alan Reynolds at Oracle with the subject line "Oracle Usage and Licensing." On information and belief, this email thread provided the additional input requested by Allison Bell. In the body of the email, Oliver Fish stated: "See below and let me know if this information can be utilized." The email thread below Oliver Fish's email disclosed the following additional details about NECAM's planned use of the Oracle database with NECAM's Integra ID-5 application: "Oracle is included and installed as part [of] our application. We launch a standard set of scripts as part of application installation, but it is also configured through our application interface."

24.     Allison Bell responded to Oliver Fish by email on December 20, 2016. In that email, Allison Bell states: "I will try to resubmit [the ESL APRF] with the below information." (The term "below information" in Allison Bell's email referred to the information provided in the email thread forwarded by Oliver Fish the day before (December 19).) Allison Bell's email on December 20 also indicated she was seeking "final approvals" within Oracle for a draft of the ESL APRF.

25.     On information and belief, Allison Bell and others on the Oracle sales team actively sought or promoted revisions to the ESL APRF that would qualify customers, like NECAM, for an Embedded license instead of offering a different license type. On information and belief, Oracle incentivized this behavior through a coercive compensation scheme in order to enhance revenues through its Audit, Bargain, Close tactics.

26.     Despite knowing that NECAM's Integra ID-5 application would be able to "provide customized reports" from data retrieved from an Oracle database, Oracle's salespeople continued to push NECAM to accept an Embedded license to the Oracle database. On January 20, 2017, Allison Bell emailed an updated price quote for an Embedded Software License to Oliver Fish. Alan Reynolds at Oracle was copied on this email communication. In the email, Allison Bell stated: "Worked through this proposal a bit more last night, please see attached." Allison Bell also stated that the proposal "might be a bit more clear on the different options and values." The quote was provided in an Excel spreadsheet attached to Allison Bell's email and dated January 19, 2017. The quote was prepared by Allison Bell and Greg Walker, both at Oracle. The only license presented in the quote was an ESL. The "options" presented in the quote were different ways to pay for the ESL: "Pay As You Go" or "2 Year Prepay."

27.     Ultimately, Oracle approved NECAM's ESL APRF as revised by, or revised according to guidance by, Allison Bell at Oracle. The approved ESL APRF was signed by Carlo Lagdamen, Manager of Solution Engineering for NECAM, on March 7, 2017, and transmitted to Oracle on or about the same date. In response to question G10, the ESL APRF approved by Oracle omits any reference to customized reports and instead incorporates the information first provided to Allison Bell on December 19. The approved response to question G10 states: "End User are not allowed direct access to the database and are provided reports through Integra-ID 5 application

only. The application makes configuration changes to the database, however [*sic*] we launch the install manually using standard scripts. We prepare the initial database and then install the NEC application which can then make configuration changes to the database. The database does not install through our installer. It is not a customized install however, [*sic*] it installs from disk and is configured via the standard application."

28.     On March 8, 2017, the revised ESL APRF was countersigned by Dennis Cartey, Deal Specialist for Oracle America, Inc.

29.     Subsequently, Oracle and NECAM executed an Embedded Software License Distribution Addendum to the Oracle PartnerNetwork Master Distribution Agreement between NEC Corporation of America and Oracle America, Inc. The addendum expressly prevents NECAM from distributing the Oracle database under any other software license type offered by Oracle. Section 1(x) states: "The application program(s) described on the applicable application package registration form and with which the programs are embedded must not be distributed under any other Oracle distribution agreement."

30.     Aware of NECAM's intended use of the Oracle software, Oracle granted NECAM a license knowing that the restrictions present in the Embedded license type selected by Oracle would not permit NECAM to use the Oracle software as it intended. In other words, Oracle promised to authorize NECAM's use of the Oracle software without ever intending to honor that promise.

31.     NECAM relied on the selection of the Embedded license type by Oracle's salespeople and the false representation that the Embedded license would authorize NECAM's intended use of the Oracle software. NECAM's reliance was reasonable given that NECAM was required to submit a registration form, NECAM disclosed the intended use of Oracle's software in that registration form, and Oracle continued to push NECAM to take the Embedded license.

32.     Absent Oracle's misrepresentation, NECAM would have selected a less restrictive license structure or pursued a license to database software from another vendor.  NECAM has been damaged by Oracle's fraud and misrepresentations in an amount to be proven at trial.

33.     The aforementioned acts of the counterclaim defendants, and each of them, were willful and malicious so as to justify an award of exemplary and punitive damages.

## SECOND COUNTERCLAIM

### Copyright Misuse

34.     NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-33, inclusive, of these Counterclaims.

35.     NECAM is entitled to a judicial declaration that Oracle's copyright in the Oracle Database (as defined in paragraph 11 of Oracle's Complaint for Copyright Infringement and Breach of Contract, D.I. 1 ("Complaint"), including but not limited to all editions of the Oracle Database identified in paragraph 12 of Oracle's Complaint) and the Database Options and Packs (as defined in paragraph 12 of Oracle's Complaint) are unenforceable due to copyright misuse for one or more of the reasons described below in parts A, B, and/or C of this Second Counterclaim, and NECAM is entitled to an injunction preventing Oracle from conducting the activities described below in parts A, B, and C of this Second Counterclaim.

### A. Preventing Customized Reports

36.     Oracle has committed copyright misuse through its practice of pushing the Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from delivering the full features available in NEC's own software, over which Oracle has no claim of copyright.

37.     NECAM's software includes a feature that allows for customization of reports presented to the end user. NECAM may also customize its software to generate reports according to an end user's requirements. The customization of NECAM's software and the ability to generate customized reports are features developed entirely by NECAM without any contribution or involvement by Oracle. Oracle's software retrieves information from a database, but it is NECAM's software that determines what information is needed and how that information should be reported to the end user. Oracle's Embedded license seeks to prevent NECAM from delivering the full functionality of NECAM's own software, over which Oracle has no claim of copyright. And Oracle also has no ownership claims over the data that is stored in Oracle's database. This is copyright

misuse because it attempts to enlarge the scope of the monopoly protected by Oracle's copyright, it frustrates the purpose of copyright by stifling innovation by NECAM, and through restrictions such as these Oracle is essentially interfering with its partners' (or customers') ability to use their own copyrighted works and data.

**B. <u>Preventing Application Customization and Development</u>**

38.     Oracle has committed copyright misuse through its practice of pushing the Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from modifying NEC's own software, over which Oracle has no claim of copyright.

39.     In letters addressing Oracle's audit findings, Oracle complains that "NECAM customizes its application for each of its end users, which is a further violation of the ESL Addendum." Oracle also complains that "NEC installs feature updates and bug fixes in the end user's systems, on their behalf." Here, Oracle is attempting to prohibit NECAM from modifying and updating NECAM's own software – a software developed without any contribution or involvement by Oracle and over which Oracle has no claim of copyright. This is another instance of copyright misuse because it attempts to enlarge the scope of the monopoly protected by Oracle's copyright, and it frustrates the purpose of copyright by stifling innovation by NECAM.

**C. <u>Preventing Remote Maintenance and Support of NECAM Software</u>**

40.     Oracle has committed copyright misuse through its practice of pushing the Embedded license to facilitate Oracle's predatory Audit, Bargain, Close strategy because these practices attempt to enlarge Oracle's copyright monopoly by preventing NEC from providing support services for NEC's own software, over which Oracle has no claim of copyright.

41.     In Oracle's letter to NECAM dated April 1, 2021, Oracle complains that "NEC installs feature updates and bug fixes in the end user's systems, on their behalf." Here, Oracle is attempting to prevent NECAM from developing and deploying new features and bug fixes in NECAM's own software, over which Oracle has no claim of copyright. Oracle also complains that Oracle provides "monitoring and incident notification for networks and wireless devices, servers, applications, and IP telephony platforms" as well as "support services including configuration

management, trend analysis, and dedicated support resources." Here, Oracle is attempting to prevent NECAM from offering support services to customers of NECAM's own software, over which Oracle has no claim of copyright. This is yet another instance of copyright misuse because it attempts to enlarge the scope of the monopoly protected by Oracle's copyright, and it frustrates the purpose of copyright by stifling innovation by NECAM.

### THIRD COUNTERCLAIM

### California Business & Professions Code § 17200

42.    NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-41, inclusive, of these Counterclaims.

43.    Oracle has committed, and on information and belief continues to commit, certain business acts and practices (*i.e.*, ABC tactics) that actually harmed NECAM and those in the general public similarly situated to NECAM. Those actionable and unfair business acts and practices are already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein. The hereinabove allegations of business acts and practices become actionable under California's Unfair Competition Law in conjunction with the following additional allegations.

44.    The recited facts show that Oracle has engaged in a pattern of behavior that is deceptive, fraudulent, unethical, oppressive, and unfair. In particular, Oracle misrepresented the nature of the inquiry in question G10 of the registration form and the contours of the restrictions set forth in the Embedded license. Oracle fraudulently induced NECAM to believe that it could, among other things, customize reports under the Embedded license model. On information and belief, at the time of these misrepresentations and fraudulent inducements, Oracle knew it would take contrary positions in a subsequent audit.

45.    After fraudulently inducing NECAM to sublicense Oracle software using the Embedded license, Oracle then laid in wait—for years—before requesting an audit. The lengthy delay meant the hidden cost of using Oracle software would continue to snowball—at list price—and that

it would be much more difficult with the passage of time for NECAM to find evidence of Oracle's contrary statements. And when Oracle did conduct the audit, it refused to give effect to its prior directions and representations to NECAM; it ignored plain terms in the agreement that limited Oracle's claims to a 2-year period; and it insisted that "may not" has the same meaning as "must not." Such business acts and audit practices are "unlawful" in that they are forbidden by law.

46.     Such business acts and ABC audit practices are "unfair" in that they offend an established public policy and/or are immoral, unethical, oppressive and/or substantially injurious to NEC and other Oracle licensees.

47.     Such business acts and audit practices are "fraudulent" in that they did mislead NEC and are likely to mislead members of the general public that are Oracle licensees or potential Oracle licensees. At all relevant times, NEC relied on Oracle's misrepresentations, misleading statements, and conduct, such as its assertions that the audit would be conducted fairly and in a cooperative and transparent matter, and those in the general public similarly situated will likely also rely on the same fraudulent and material representations in the future.

48.     Because such business acts and practices are unlawful, unfair and fraudulent, they violate California's Unfair Competition Law ("UCL "), Business & Professions Code §§ 17200, et seq., and are actionable by NEC for injunctive relief and restitution in an amount to be proven at trial.

## FOURTH COUNTERCLAIM

### Breach of Contract

49.     NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-48, inclusive, of these Counterclaims.

50.     The conduct of Oracle described in the foregoing paragraphs demonstrates that Oracle has breached its contractual obligations to NECAM in at least the following ways. By claiming during its audit of NECAM in October 2020 that the activities and uses of software previously disclosed by NECAM on Oracle's registration forms now violate the restrictions in the Embedded license, Oracle violates its representation that the Embedded license authorized NECAM's intended use. By seeking

damages beyond the 2-year contractually-imposed limitations period, Oracle violates an express term of the 2013 MDA. By arguing "may not" has the meaning of "must not," Oracle unreasonably and groundlessly seeks to restrict NECAM's authorized use of Oracle's software by rewriting a key term of the agreement between the parties. Oracle also breached the agreement between the parties by terminating the agreement without cause on the basis of an audit report that contradicts the terms of the agreement between the parties. Oracle has also breached the agreement by conducting a predatory audit that has unreasonably interfered with NECAM's normal business operations in violation of the audit clause.

## FIFTH COUNTERCLAIM

### Breach of Implied Covenant of Good Faith and Fair Dealing

51. NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-50, inclusive, of these Counterclaims.

52. The conduct of Oracle described in the foregoing paragraphs demonstrates that Oracle failed to act fairly and in good faith in negotiating a software license with NECAM and in its conduct under the agreements with NECAM. Such conduct may be summarized, without limitation, as follows.

53. On information and belief, Oracle pushes clients toward the most restrictive type of license, the Embedded license, as part of a business strategy and pattern of conduct called "Audit, Bargain, Close," or "ABC." On information and belief, as part of the ABC strategy, Oracle pushes clients to purchase the Embedded license with the expectation that the client's intended use of the Oracle software would violate the restrictions of the Embedded license so that Oracle may later audit the client's operations and demand unreasonable and exorbitant penalties when the expected violations are found by Oracle's auditors.

54. On information and belief, Oracle pursued the ABC strategy against NECAM, and has pursued the same strategy against other Oracle licensees. On information and belief, Oracle pushed NECAM toward the most restrictive type of license, the Embedded license, having the expectation

that NECAM's intended use would violate the restrictions of the Embedded license. NECAM completed and submitted registration forms to Oracle that disclosed NECAM's intended use of the Oracle software. On information and belief, Oracle expected that such use would violate the restrictions of the Embedded license. Oracle even directed NECAM to reinterpret at least one key question on the registration form such that NECAM's disclosure would be altered to qualify for the Embedded license. Oracle then directed NECAM to sublicense Oracle software using the Embedded license and waited years before auditing NECAM's operations. Once the audit was underway Oracle ignored its directions and representations to NECAM, ignored terms such as the contractually-imposed 2-year limitations period, unilaterally construed ambiguities in the Oracle agreements against NECAM, and asserted claims against NECAM based on Oracle's list price and demanded unreasonable and exorbitant penalties from NECAM for the issues that NECAM disclosed to Oracle in advance of entering into the license. When NECAM pointed out Oracle's conduct was predatory and inappropriate, Oracle terminated NECAM's license.

55.    The foregoing conduct, Oracle's refusal to take responsibility for directing NECAM to sublicense Oracle software using the Embedded license, Oracle's decision to ignore unfavorable contract terms, and its insistence at rewriting its own agreement (e.g., claiming that "may not" means "must not") are all examples of Oracle's failure to act fairly and in good faith.

## SIXTH COUNTERCLAIM

### Intentional Interference with Contractual Relations /
### Intentional Interference with Performance of Contract

56.    NECAM realleges and incorporates by reference as if set forth in full in this First Counterclaim: NECAM's responses to paragraphs 1-44, inclusive, of Oracle's Complaint; the allegations contained in paragraphs 1-77, inclusive, of NECAM's Affirmative Defenses; and each of paragraphs 1-55, inclusive, of these Counterclaims.

57.    NECAM is entitled to a judgment that Oracle has intentionally interfered with NECAM's contractual relations and/or a judicial declaration that Oracle's intentional conduct will, or will continue to, interfere with NECAM's contractual relations.

58.     NECAM has existing contracts with numerous customers for the provision and support of the Integra ID-5 application with Oracle database software. NECAM customers with existing contracts impacted by Oracle's predatory Audit, Bargain, Close tactics include the NECAM customers specifically identified by Oracle in its October 8, 2020 Audit Report to NECAM. At all relevant times, the contracts with the identified customers have been valid and enforceable.

59.     Oracle has known about NECAM's contractual relationship with each of these customers since mid-to-late 2020. NECAM disclosed its deployment of the Integra ID-5 application to each of these customers in connection with Oracle's 2020 audit of NECAM, and Oracle's October 8, 2020 Audit Report identified NECAM's deployment to each of these customers as a violation of the Embedded license Oracle granted to NECAM.

60.     Oracle has disrupted NECAM's contractual relationship with each of these customers by making it more expensive and more burdensome for NECAM to provide and support the Integra ID-5 application for these customers. Oracle has made, and will continue to make, it more expensive for NECAM to provide and support the Integra ID-5 application for these customers by demanding additional license fees not owed to Oracle. Oracle has made, and will continue to make, it more burdensome for NECAM to provide and support the Integra ID-5 application by misusing its copyright to restrict NECAM's ability to develop and support NECAM's ID-5 application for these customers.  Oracle has made, and will continue to make, it more burdensome for NECAM to provide and support the Integra ID-5 application for these customers by purporting to terminate NECAM's license and PartnerNetwork distribution agreement for the Oracle database software.

61.     The aforementioned conduct by Oracle was designed and intended to disrupt NECAM's contractual relationships with identified customers in order to pressure and extort NECAM to pay additional license fees to Oracle that were not owed under NECAM's existing agreement with Oracle, including but not limited to the purchase of additional licenses at elevated "list" prices.

62.     NECAM has been damaged and will continue to be damaged at least in the form of lost profits, lost revenues, loss of reputation, and diminution in the value of its business (in amounts to be proved at trial) as the result of Oracle's conduct as described in foregoing paragraphs incorporated herein by reference, including at a minimum, Oracle's baseless claims for additional

licensing fees, Oracle's copyright misuse and attempts to restrict NECAM's ability to develop and support NECAM's Integra ID-5 application, and Oracle's purported termination of NECAM's license and PartnerNetwork distribution agreement. The aforementioned conduct by Oracle was the substantial, direct, and proximate cause of the harm to NECAM.

63.     The aforementioned acts of the counterclaim defendants, and each of them, were willful and malicious so as to justify an award of exemplary and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, NECAM as Counterclaim Plaintiff respectfully requests that this Court enter judgment in its favor and against Oracle as follows:

A.     Enter judgment for NECAM and against Oracle on Oracle's First Cause of Action for breach of contract against NECAM;

B.     Enter judgment for NECAM and against Oracle on Oracle's Second Cause of Action for copyright infringement against NECAM;

C.     Enter judgment for NECAM and against Oracle on NECAM's First Counterclaim for intentional misrepresentation and / or false promise by Oracle;

D.     Enter judgment for NECAM and against Oracle on NECAM's Second Counterclaim for copyright misuse by Oracle and declare Oracle's copyright in the Oracle Database and the Database Options and Packs unenforceable;

E.     Enter an injunction preventing Oracle from enforcing its copyright in the Oracle Database and the Database Options and Packs until Oracle discontinues the conduct constituting copyright misuse;

F.     Enter judgment for NECAM and against Oracle on NECAM's Third Counterclaim for violation of California's Unfair Competition Law, Business & Professions Code §§ 17200, et seq., by Oracle;

G.     Enter an injunction preventing Oracle from engaging in the Audit, Bargain, Close pattern of conduct or any related unlawful, unfair, or fraudulent activity in violation of California's Unfair Competition Law, Business & Professions Code §§ 17200, et seq.;

NECAM'S ANSWER AND COUNTERCLAIMS

H.   Enter an injunction instructing Oracle to abide by and honor the terms of the Embedded Software License it granted to NECAM for the agreed term of the license;

I.   Enter an injunction preventing Oracle from asserting a violation of Oracle's Embedded Software License, from demanding any fees or other consideration during an audit, and from terminating the Embedded Software License granted to NECAM based on NECAM's use of Oracle software as originally disclosed by NECAM on Oracle's Embedded Software License Application Package Registration Form;

J.   Enter judgment for NECAM and against Oracle on NECAM's Fourth Counterclaim for breach of contract by Oracle;

K.   Enter judgment for NECAM and against Oracle on NECAM's Fifth Counterclaim for breach of the implied covenant of good faith and fair dealing;

L.   Enter a judgment for NECAM and against Oracle on NECAM's Sixth Counterclaim for intentional interference with contractual relations and declare that Oracle's intentional conduct interfere, and will continue to interfere, with NECAM's contractual relations;

M.   Enter an injunction preventing Oracle from engaging in the conduct intended to interfere with NECAM's contractual relations;

N.   Enter an award for economic and consequential damages in an amount to be determined according to proof;

O.   Enter an award for punitive damages against Oracle in an amount to be determined by the Court according to proof;

P.   Enter an award for post-judgment interest for the maximum amount allowed by law;

Q.   Enter an award to NECAM for its attorneys' fees, costs, and expenses under 17 U.S.C. § 505 or other authority as applicable; and

R.   Grant to NECAM all further relief as the Court may deem proper and equitable under the circumstances.

1

## JURY DEMAND

2

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant and Counterclaim

3

Plaintiff NECAM hereby demands trial by jury of all issues so triable.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2   Date: September 1, 2021                          Respectfully submitted,

3                                                    /s/ Kristoffer Leftwich

4                                                    Pamela K. Fulmer (Cal. Bar No.154736)
                                                     pam@tacticallawgroup.com
5                                                    Dee A. Ware (Cal. Bar 154549)
                                                     dware@tacticallawgroup.com
6                                                    Tactical Law Group LLP
                                                     4 Embarcadero Center, Suite 1400
7                                                    San Francisco, CA  94111
                                                     Telephone: (415) 766-3509
8                                                    Fax: (415) 231- 5272

9                                                    Li Chen (*pro hac vice*)
                                                     lchen@chenleftwich.com
10                                                   Kristoffer Leftwich (*pro hac vice*)
                                                     kleftwich@chenleftwich.com
11                                                   Chen Leftwich LLP
                                                     8501 N MacArthur Blvd #631009
12                                                   Irving, TX 75063
                                                     Telephone: (214) 627-9950
13                                                   Fax: (214) 627-9940

14                                                   Attorneys for Defendant and Counterclaim
                                                     Plaintiff NEC Corporation of America
15

16

17                                 **CERTIFICATE OF SERVICE**

18          I hereby certify that on September 1, 2021, that the foregoing document was filed with the

19   Court's CM/ECF system which will provide notice to all counsel deemed to have consented to

20   electronic service. All other counsel of record not deemed to have consented to electronic service

21   were served with a true and correct copy of the foregoing document by electronic mail on this day.

22

23                                                   /s/ Kristoffer Leftwich

24

25

26

27

28

NECAM'S ANSWER AND COUNTERCLAIMS